REVISED - August 5, 1999

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-20340

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN P. MILLER,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

July 1, 1999

Before JONES and STEWART, Circuit Judges, and DUPLANTIER,[*] District Judge.

CARL E. STEWART, Circuit Judge:

Before the court is an appeal from the sentence imposed upon Defendant-Appellant John P. Miller ("Miller") after his guilty-plea conviction for conspiracy to possess with the intent to distribute cocaine pursuant to 21 U.S.C. § 846 (1994). He was arrested at his place of business, Khan's Auto Repair ("Khan's"), in possession of 2.2 kilograms of cocaine after he attempted to sell cocaine to a confidential informant. Miller told authorities that he had agreed to sell the cocaine for Ted Tronson ("Tronson"), a drug smuggler from Belize, and that he was to deposit the proceeds into a specified bank account. This appeal requires us only to decide whether, in sentencing him, the district court erred in declining to apply the safety valve provision of the United States Sentencing Guidelines

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

("Guidelines"). For the reasons given below, we determine that it did, and we vacate and remand for resentencing.

**I**

Prior to Miller's offense of conviction, he was involved in drug activities on two previous occasions. Three-and-a-half years before the instant offense, on December 19, 1993, authorities arrested Miller and Mike Smith ("Smith") at a Border Patrol checkpoint between the United States and Mexico after agents found that a motor home driven by Smith contained 400 pounds of marijuana hidden in secret compartments built by Miller. Miller, accompanied by two of his children, was following the motor home in his own vehicle. A federal grand jury indicted Miller, but the charges were later dismissed due to Miller's ongoing health problems.[1]

The second event occurred on August 31, 1995. Drug Enforcement Administration ("DEA") agents conducting surveillance of a residence observed Miller and another man enter it and subsequently leave with a package. A later traffic stop revealed that the package contained five kilograms of cocaine. In lieu of prosecution, however, Miller became a confidential informant ("CI"); thus, his prior drug activity resulted in neither prosecution nor conviction.

Beginning in September 1995, Miller worked as a CI for the DEA, but DEA agents described his efforts as "half-hearted at best." These agents were presumably not surprised, then, when they learned in the spring of 1997 that Miller was selling cocaine at Khan's. The agents subsequently arranged a drug purchase, which they would monitor, initiated by another CI. The sting began on May 29, 1997, when Miller and his eight-year-old son met the other CI in a grocery store parking lot and advised him that he had two kilograms of cocaine to sell. Miller told this CI, however, that the cocaine had "gotten wet" and that "he would have one [kilogram] ready for sale by the following day." Miller agreed to sell the dry kilogram of cocaine for $17,000. On May 30, 1997, the other CI

---

[1] Miller was suffering from kidney disease and endured dialysis for three years before a kidney transplant in August 1997.

met with Miller, who was again accompanied by his son, at Khan's. After verifying that Miller had the cocaine, the other CI gave the arrest signal and agents seized two kilograms of cocaine.

Miller told authorities that he was selling the cocaine for Tronson and that he was to be paid $1,000 for each kilogram sold. Miller stated that he had been instructed to deposit the proceeds from the sale of the cocaine into Tronson's personal bank account, and to that end he claimed that Tronson had given him four deposit slips. Miller stated that he needed the extra money generated from the sale of the cocaine to pay his medical bills.

At a post-arrest interview with a probation officer, Miller discussed his involvement in the offense of conviction and provided a written statement. The statement explained that he was approached by Tronson to sell the cocaine and that Tronson had explained the procedure for drying cocaine to him. On January 12, 1998, Miller pled guilty to conspiracy to possess with the intent to distribute cocaine.

Prior to Miller's sentencing, and as part of his plea agreement, Miller and his attorney met with the Government so that he could provide information relating to the offense of conviction. Although Miller admitted at this meeting the knowing receipt of the cocaine and its distribution, the Government believed that he did not provide truthful information concerning his prior drug activity. According to the Government, Miller was untruthful when he stated (1) that he had never been involved in the sale or distribution of drugs; and (2) that he had learned how to dry cocaine for the first time just preceding his arrest for the offense of conviction.

Under the Guidelines, Miller's applicable sentencing range would have been 57 to 71 months' imprisonment;[2] § 846, however, carries a mandatory minimum sentence of 60 months. At sentencing, Miller requested that the court not apply the statutory mandatory minimum sentence and instead

_____

[2] Miller's base offense level was 28 for his possession of "[a]t least 2 KG but less than 3.5 KG of Cocaine." USSG § 2D1.1(c)(6). Had the district court found that Miller met the criteria of the safety valve provision, discussed *infra*, he would have automatically received a decrease in his offense level to 26. See id. § 2D1.1(b)(6). Furthermore, Miller was entitled to (and did receive from the district court) a 3-level decrease for acceptance of responsibility. See id. § 3E1.1. Consequently, his recalculated base offense level would be 23, resulting in a Guideline range of 46 to 57 months' imprisonment.

3

apply the "safety valve" provision of the Mandatory Minimum Sentencing Reform Act of 1994 §

80001(a), 18 U.S.C. § 3553(f) (1994 & Supp. II 1996) and the U.S. SENTENCING GUIDELINES

("USSG") MANUAL § 5C1.2 (1998) in order to sentence him according to the Guidelines.[3]  The

Government objected to Miller's request, arguing that, because Miller did not meet all the

requirements under the safety valve provision,[4] he was not eligible for the reduction.  The district

court agreed with the Government that Miller had lied in his statement.  The court further determined

that "any other drug activity" referenced in the safety valve provision constituted relevant conduct

and that Miller had lied about that conduct.  On April 6, 1998, the court sentenced Miller to 60

months' imprisonment, the mandatory statutory minimum sentence, followed by four years'

supervised release and the payment of a special assessment.  Miller objected to this determination and

timely filed a notice of appeal with respect to the district court's failure to apply the safety valve

provision.

## II

### A

We review a sentencing court's findings of fact pertaining to a § 5C1.2 reduction for clear

error.  See United States v. Vasquez, 161 F.3d 909, 910 (5th Cir. 1998) (per curiam).  We review the

district court's legal interpretation of that provision *de novo*.  See id.

The safety valve provision is an exception to the general rule under the Guidelines that, if the

statutory mandatory minimum sentence is greater than the maximum Guideline range,[5] the statutory

sentence must be the Guideline sentence.[6]  See USSG § 5G1.1(b).  The safety valve provides that,

---

[3] The Guidelines wholly incorporate § 3553(f); for simplicity's sake, we will hereinafter refer only to USSG § 5C1.2.

[4] In particular, the Government argued that Miller was untruthful in the information he gave regarding his prior offenses.  We address the Government's argument *infra*, at Section III.

[5] We note that such would have been the case had the district court applied the safety valve provision, since the Guidelines would have awarded Miller a sentence between 46 and 57 months.

[6] The safety valve provision allows a defendant to "double-dip" into the court's leniency, as it were.  Not only must a defendant entitled to the safety valve be sentenced according to the Guidelines

4

for convictions of certain drug offenses, the "court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence" if the defendant meets certain requirements. Id. § 5C1.2; see United States v. Rodriguez, 60 F.3d 193, 195 (5th Cir. 1995). A defendant is eligible for the safety valve if the sentencing court finds that

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . .;
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence *the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan*, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

USSG § 5C1.2 (emphasis added); see also United States v. Wilson, 105 F.3d 219, 221 (5th Cir. 1997) (per curiam) (emphasizing that a defendant "shall" be sentenced according to the Guidelines, as opposed to the statutory minimum, if he or she meets these five requirements). The safety valve exists "to allow less culpable defendants who fully assist[] the Government to avoid the application of the statutory mandatory minimum sentences." Rodriguez, 60 F.3d at 196 (citing H.R. REP. NO. 103-460, at 4-6 (1994)). Regardless whether the Government requests any information from a defendant, a party seeking to invoke the safety valve bears the burden of "ensuring that he has provided all the information and evidence regarding the offense to the Government." United States

---

instead of the statutory sentence, see discussion *infra*, but the defendant is also entitled to a base offense level reduction for meeting the requirements of § 5C1.2 even before that Guideline sentence is calculated. See *supra* note 2 & accompanying text.

Were this outcome not the case, the safety valve would in many cases have little or no effect. For instance, in the case at bar, absent the two-point safety valve reduction, Miller's applicable sentence would have been 57 to 71 months under the Guidelines, and he would at best receive a sentence three months shorter than his current one.

v. Flanagan, 80 F.3d 143, 146-47 (5ᵗʰ Cir. 1996).  Commentary to § 5C1.2 provides, somewhat opaquely, that offenses constituting the "same course of conduct" or a "common scheme or plan" include "the offense of conviction and all relevant conduct." USSG § 5C1.2 application note 3.

Although § 5C1.2 does not define "relevant conduct," § 1B1.3 discusses "relevant conduct" for purposes of sentencing, and commentary to that section assists us in understanding the two closely-related concepts of offenses part of a "common scheme or plan" and those part of the "same course of conduct."  In order for two offenses to be part of a "common scheme or plan," they must be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."  USSG § 1B1.3 application note 9(A).  Other offenses not encompassed under the first rubric "may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  Id. § 1B1.3 application note 9(B); see also Wilson, 105 F.3d at 222 ("[T]he commentary to the guideline is controlling when it functions to interpret or explain how the guideline is to be applied.").

The district court adopted the Government's position, determining that the prior drug activity was part of the same course of conduct, and ruled that Miller did not satisfy the safety valve's fifth prong because he did not truthfully disclose everything about his prior involvement with drug possession and distribution.  See § 5C1.2(5).  We must decide whether Miller's prior drug activities, coupled with the offense of conviction, qualify as part of the "same course of conduct" or "common scheme or plan;" if not, then the district court erred in determining that Miller's less-than-truthful admissions to the Government caused him to forfeit his right to application of the safety valve provision.

Miller does not contest the district court's conclusion that he lied about his prior drug activities.  He instead argues on appeal, as he did to the district court, that he was not required to divulge information about the two previous drug-related incidents because they were not "part of the same course of conduct or of a common scheme or plan" as required by the Guidelines.  Id.

6

Specifically, Miller contends that his offense of conviction, involving cocaine trafficking, bore no relationship to the marijuana arrest that occurred at the border or his prior cocaine-related activity.

Concerning the marijuana incident, Miller contends that it was different from his offense of conviction because it involved different participants, different victims, different *modus operandi*, different types of drugs, and the offenses were separated by more than three years. Concerning the first cocaine incident, Miller argues that the only similarity to his offense of conviction is that they both involved cocaine. Otherwise, the two cocaine offenses were separated by 21 months and involved different participants and suppliers.

The Government, on the other hand, argues that Miller does not qualify for the safety valve exception because he has not been completely candid about his past drug offenses and because his previous offenses are similar to the instant offense. The Government contends that Miller was not truthful regarding his experience with drying cocaine and in answering the interrogatory whether he had even been involved in the sale or distribution of drugs prior to his offense of conviction. As to the similarity of the offenses of conviction and his prior drug activities, the Government contends that all of Miller's drug offenses shared the common purpose of possession with intent to distribute "illegal narcotics" for profit.[7] According to the Government, the offenses were similar because they involved a conspiracy—possession with the intent to distribute narcotics—drug amounts larger than for personal use, and at least one of Miller's children was present at each offense.

**B**

Because Miller's prior drug activities were not substantially connected or sufficiently related to the offense of conviction, they did not constitute a common scheme or plan or the same course of conduct within the meaning of § 5C1.2(5). As a result, Miller was entitled to a downward departure under the safety valve provision.

**1**

---

[7] We assume that the Government is aware that marijuana is not a narcotic and that references in its brief are meant to include all drugs, and not just narcotics, in describing the similarity of Miller's offense of conviction with his prior drug activities.

Miller's prior drug activities were not part of a common scheme or plan as described by the Guideline commentary. See USSG § 1B1.3 application note 9(A). Neither the marijuana incident nor the 1995 cocaine incident were "substantially connected" to the offense of conviction. They did not share any of the common factors laid out by the commentary, at least one of which is required to infer a "common scheme or plan." The activities did not involve common victims or accomplices, share similar *modus operandi*, or serve a common purpose beyond the fact that they were drug transactions.[8] As such, Miller's prior offenses cannot appropriately be viewed as part of a "common scheme or plan" with the offense of conviction.

**2**

Although Miller's prior activities and the instant offense are arguably part of the "same course of conduct," we are also not persuaded that his sentence was appropriately determined under this rationale. The commentary to § 1B1.3 provides that offenses must be "sufficiently connected or related to each other to warrant the conclusion that they are . . . ongoing series of offenses." USSG § 1B1.3 application note 9(B). In determining sufficient connection, a court may consider, *inter alia*, the following factors: (1) the degree of similarity between the offenses; (2) the regularity or repetitions of the offenses; and (3) the time interval between the offenses.[9] See id.; see also United

---

[8] The 1995 cocaine incident and the offense of conviction arguably involved a "common purpose." USSG § 1B1.3 application note 9(A). In both instances, Miller was a party to an illegal cocaine transaction. We do not believe, however, that simply because the two transactions were for amounts larger than for personal use or because Miller may have engaged in drug transactions in order to pay his medical bills, that we can infer a "common scheme or plan" when other indicia do not in any way support such a conclusion. The district court, by defining relevant conduct as "any other drug activity" was able to make this leap, but the Guidelines do not support such a broad definition, and we decline to follow the district court's example.

[9] The commentary also provides that the "nature of the conduct" may also be a "relevant consideration." USSG § 1B1.3 application note 9(B). As an example, the commentary cites a defendant's failure to file an income tax return in three consecutive years as part of the same course of conduct where the tax return is statutorily required at precise yearly intervals. We do not believe that the "nature of the conduct" is a relevant inquiry in Miller's case. Although it is true that the "nature" of Miller's conduct—trafficking in illegal drugs—is the same in all three incidences, the conduct does not involve the repetition of an identical act with precise regularity, as the commentary suggests would be necessary to find the "same course of conduct" under a "nature of the conduct" inquiry.

States v. Hahn, 960 F.2d 903, 910-11 (9th Cir. 1992) (applying the factors). According to the commentary and those cases that have addressed the issue, "[w]hen one of the above factors is absent, a stronger presence of at least one of the other factors is required." USSG § 1B1.3 application note 9(B); see United States v. Bethley, 973 F.2d 396, 401 (5th Cir. 1992); Hahn, 960 F.2d at 910-11.

Since both of Miller's prior drug activities are relatively remote in time from the offense of conviction,[10] "a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity" in order for the offenses to be part of the "same course of conduct." USSG § 1B1.3 application note 9(B); Bethley, 973 F.2d at 401; Hahn, 960 F.2d at 910-11. As we will explain, because neither of these factors weighs heavily in favor of the Government, the district court erred in considering Miller's prior drug activities to be relevant conduct.

**(a)**

As for the marijuana incident, there were no similarities between it and and the offense of conviction, apart from the fact that the offenses involved drugs and that Miller's son was present. The marijuana incident involved Miller's following a motor home that contained marijuana into the United States, while his offense of conviction involved the selling of cocaine out of Miller's place of business. Additionally, the two events, separated as they are by time and circumstances, cannot be

---

[10] The marijuana incident at the border occurred nearly four years before Miller's offense of conviction; thus, it clearly does not satisfy the proximity requirement. His 1995 cocaine offense, however, occurred 21 months before his offense of conviction and is, therefore, a closer question. The longest time span between prior activity and an offense of conviction in a previous 5th Circuit case has been 18 months. See United States v. Robins, 978 F.2d 881, 890 (5th Cir. 1992); see also United States v. Bryant, 991 F.2d 171, 177 (5th Cir. 1993) (per curiam) (three months); Bethley, 973 F.2d at 400-01 (six months); United States v. Moore, 927 F.2d 825, 827-28 (5th Cir. 1991) (five months); United States v. Mir, 919 F.2d 940, 943-45 (5th Cir. 1990) (same). A sister circuit has ruled that activity separated by two or more years is temporally too remote. See United States v. Mankiewicz, 122 F.3d 399, 405 (7th Cir. 1997) (ruling that drug transactions separated by a five-year hiatus were too remote to support the finding that the transactions constituted relevant conduct); United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir. 1993) (finding that a two-year hiatus between the transactions did not lend itself to a finding of temporal proximity and noting that the court "must be cautious and exacting in permitting such relatively stale dealings to be included in the same course of conduct as the offense of conviction"). While 21 months is not automatically too remote for consideration as relevant conduct, we nonetheless hold that other factors must be authoritatively present in order to overcome this long gap.

9

considered repetitious or regular conduct to a degree significant enough to constitute sufficient connection under the Guidelines. Consequently, Miller was not required to provide the Government with information relating to the marijuana incident.

**(b)**

Although the 1995 cocaine incident and the offense of conviction both involved cocaine, the two events are not sufficiently connected to justify finding that they were part of the "same course of conduct." The only real similarity between the two instances is that they both involved a transaction for the sale of cocaine. Miller was a buyer during the first transaction and a seller at his offense of conviction. The first transaction occurred at a residence and was discovered during a traffic stop while his offense of conviction occurred at his place of business and involved a CI. Additionally, there is no evidence that the cocaine supplier was the same for both transactions. Thus, given the 21-month separation and the dissimilarity, the two offenses did not constitute the "same course of conduct."

**III**

Although we have determined that the district court erred by failing to apply the safety valve provision to Miller's case, we must address as a collateral matter the Government's primary argument on appeal—that Miller's false claims concerning cocaine drying independently justified the district court's refusal to award the reduction under § 5C1.2.[11] Miller claimed that he first learned how to dry cocaine during the May 1997 offense, but the Government argues that, because Miller was no stranger to cocaine trafficking, he surely lied when he explained to DEA agents at the time of his arrest in May 1997 that he had only just learned how to dry cocaine, returning it to powder form. This disingenuousness, the Government argues, justified the court's denial of the safety valve adjustment. We are nonplussed by this line of reasoning, primarily because the court first found that Miller's offense of conviction and his prior drug activities were part of the "same course of conduct"

___

[11] The Government essentially argues only in the alternative that Miller's prior activities, when viewed in conjunction with the offense of conviction, involved a common scheme or plan and constituted the same course of conduct.

before it determined whether he lied about the prior activities. Lying about irrelevant prior activities would not impact a § 5C1.2 determination, as the Government suggests. In this case, since the prior activities should not have been included under § 5C1.2(5), Miller's alleged untruthfulness about the activities cannot serve to defeat his request for a downward departure under the Guidelines. For the sake of completeness, however, we address below the Government's argument concerning truthfulness.

Miller, in his reply brief, observes that the trial court never found that he had any prior knowledge of cocaine drying. He avers that "[b]ecause there is no reason to believe that [he] had any pre-existing knowledge of how to dry cocaine, other than the bald assertion of the Government, and because neither the Government nor the trial court ever asserted this as a reason for denying [the] application of the 'safety valve' at the sentencing hearing, this argument is both waived, and without merit."

We agree with Miller that, in this instance, the Government's assertion is based on pure speculation. Although we have not explicitly addressed these issues previously, a sister circuit has persuasively rejected such an argument. In United States v. Miranda-Santiago, 96 F.3d 517 (1st Cir. 1996), the defendant appealed the district court's finding that she did not cooperate fully with the Government. See 96 F.3d at 527-28. The defendant admitted her involvement in a drug trafficking conspiracy but asserted that her involvement was limited—that she knew that drugs were stored in her house, but that she did not handle the drugs or associated firearms. See id. at 526 n.20. The Government argued that facts could be "gleaned" from the presentence report that would support the denial of the safety valve, but it did not point to any information that the defendant must have known and refused to disclose. Id.

The First Circuit held that "where a defendant in her submissions credibly demonstrates that she has provided the government with all the information she reasonably was expected to possess, in order to defeat her claim, the government must at least come forward with some sound reason to suggest otherwise." Id. at 529 n.25 (internal citation omitted). The court rejected as "mere

11

conjecture" the argument that because the defendant lived with other codefendants, she must have known more information than she provided. Id. at 529. The court concluded that the district court's bare conclusion that the defendant did not cooperate fully, "absent either specific factual findings or easily recognizable support in the record, cannot be enough to thwart her effort to avoid imposition of a mandatory minimum sentence." Id. at 529-30. The court vacated the sentence and remanded to allow the district court to reexamine the issue and to clarify the record with supplemental findings. See id. at 530.

In United States v. White, 119 F.3d 70 (1st Cir. 1997), the First Circuit clarified Miranda-Santiago by stating that

> Miranda-Santiago in no sense suggests that the sentencing court cannot arrive at an independent determination regarding a criminal defendant's truthfulness, based on the evidence before it. Rather, we there held merely that it was clear error to conclude that the defendant had been untruthful, based solely on a PSR which directly contradicted the district court's determination.

Id. at 74. In White, the district court found that the defendant was untruthful in her attempt to minimize her role in a drug conspiracy. See id. The district court noted the length of time the defendant had been involved in the conspiracy and the nature of her conduct, which included tending to the business affairs of a conspiracy that distributed, stored, and purchased significant quantities of marijuana and generated hundreds of thousands of dollars. See id. The First Circuit determined that the district court's finding was based on extensive evidence and was a carefully considered conclusion, not the bare conclusion relied on in Miranda-Santiago. See id.

While Miller's purported untruthfulness as to his knowledge of cocaine drying would justify the denial of the safety-valve reduction, the Government's assertion that Miller lied about his knowledge of cocaine drying appears to be based simply on the fact that the process is complex and that Miller had been previously involved in cocaine trafficking. Miller told the probation officer that he only learned recently how to dry the cocaine and that Tronson had explained the procedure. The Government's assertion to the contrary is merely speculative, and we thus reject it.

**IV**

12

Because we find the record inadequate to justify the district court's decision not to grant safety valve relief, we conclude that Miller's sentence should have been reduced pursuant to § 5C1.2. Accordingly, we VACATE Miller's sentence and REMAND the case to the district court for resentencing.