**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 9, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-40674
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FELIPE FLORES,

Defendant-Appellant,

_____

Appeals from the United States District Court for the
Southern District of Texas, Corpus Christi
C-01-CR-369-1
_____

Before WIENER, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge.[*]

Felipe Flores pleaded guilty to one count of possession with intent to distribute more than five

kilograms of cocaine. At sentencing, despite the government's recommendation, the district court

refused to apply the sentencing guidelines "safety valve" provision, which would have allowed Flores

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

to be sentenced below the ten-year mandatory minimum sentence. *See* U.S.S.G. §§ 5C1.2. Flores appeals, arguing that the district court erred in refusing to apply the safety valve provision because it did so based upon its speculation that Flores withheld information concerning the offense.

We review a sentencing court's decision to apply § 5C1.2 for clear error. *See United States v. Rodriguez*, 60 F.3d 193, 195 n.1 (5th Cir. 1995). However, a district court's interpretation of the safety valve provision is reviewed *de novo*. *Id.*

The purpose of the § 5C1.2 "safety-valve" provision is to allow less culpable defendants to avoid the imposition of a statutory minimum sentence if they fully assist the government. *Rodriguez*, 60 F.3d at 196. If a defendant meets the five requirements of the safety valve, the sentencing court must base its sentence on the sentencing guidelines rather than impose the statutory minimum sentence. § 5C1.2(a); 18 U.S.C. § 3553(f). Although the government may, as in the instant case, make a recommendation with respect to the application of the safety valve, it is the court that makes "its own *independent* determination" whether a defendant has met the requirements. *United States v. White,* 119 F.3d 70, 73 (1st Cir. 1997) (emphasis in original); § 5C1.2(a) (explaining that the safety valve shall be applied "if the court finds that the defendant meets the criteria"). The fifth of these requirements, the only one at issue here, allows the defendant to avoid the statutory minimum sentence if:

> (5) not later than the time of the sentencing hearing, the defendant has *truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses* that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

§ 5C1.2(a)(5) (emphasis added); 18 U.S.C. § 3553(f)(5). It is the defendant's burden to prove all of the facts supporting the safety-valve reduction, including that he has truthfully provided the government with all relevant information and evidence. *United States v. Flanagan*, 80 F.3d 143, 146-47 (5th Cir. 1996).

In the instant case, the presentence report (PSR) provided that Flores, a permanent resident alien living in Fort Worth, stated that he was introduced by a friend to a man named "Juan," who lives in Mexico. Juan was looking for someone to transport cocaine from Mexico to Fort Worth. Flores obtained the cocaine from "Juan" in Guanajuato, Mexico, and was arrested at a border patrol checkpoint after the agents discovered 25 bundles of cocaine with a weight of 10.24 kilograms.[1]

At the initial call for sentencing, both defense counsel and the government stated that Flores had been debriefed and qualified for the safety valve. The probation officer informed the district court that based upon the application of the safety valve the defendant would avoid the ten-year statutory minimum sentence and would qualify for a guideline range of 70 to 87 months. The government recommended to the court a sentence of 70 months.[2]

The government called DEA Agent Tim Thrash to testify regarding Flores's debriefing. Agent Thrash testified that the first agent involved in the case left the office and that he (Thrash) had

---

[1] As set forth in the text, the PSR indicates that the drugs were obtained in Guanajuato, Mexico. The evidence at the sentencing hearing indicates that the drugs were obtained in Celaya. It should be noted that both the cities of Celaya and Guanajuato are located in the Mexican State of Guanajuato.

[2] Upon learning of the government's sentencing recommendation, the district court inquired "So, did he give you four years' worth of information?" The government responded, "No, not really, your Honor." Of course, the text of the safety valve provision expressly provides that "the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." § 5C1.2(a)(5).

3

been assigned to it. Agent Thrash met with Flores, and another agent fulfilled the role as a translator. Flores related to the agents that he lived in Fort Worth and there met an individual by the name of "Paco." He and Paco had "done cocaine together." At one point, Flores told Paco that "[m]oney's tight, need some bills paid, do you know anybody who can help me, you know, run drugs." Paco stated that he had "some guys in Celaya, Mexico and . . . can get in touch with them for you." Paco later arranged the transaction, instructing Flores to travel to Celaya and contact certain individuals by the name of Jorge and Juan. Flores was to bring back seven to eight kilos of cocaine and be paid $22,000. Paco fronted Flores $3,500 of the $22,500, apparently to finance the trip.

At one point during the agent's testimony, the district court, apparently addressing the entire courtroom, inquired "Anybody know where Celaya is? A young woman in the back of the courtroom." The young woman, Ms. Starcher, stated that she was in the debriefing room to translate for Flores. After defense counsel stated that the woman was his wife and his translator, the court asked whether "[s]he knows where Celaya is?" Defense counsel stated that his wife's family was from Mexico. The court decided to accept the information from Ms. Starcher. She informed the court that Celaya is "right next to Guanajuato; it's the town that's right next to it." Defense counsel stated to the court: "Judge, for the record, that's where Mr. Flores is from."

Subsequent to this interruption, Agent Thrash testified that once Flores's vehicle was loaded with the cocaine, Jorge called Flores at his mother's home "to let him know the car was ready." The court interjected "[s]o isn't it curious that Paco told him he could bring drugs from his own hometown, of all the places in Mexico?" Agent Thrash concurred. The court further stated "What a coincidence. And for him not to know more?" After making more inquiries and becoming unsatisfied with the responses, the court concluded that Agent Thrash had not "ask[ed] enough

4

questions to form an opinion." Agent Thrash responded "Yes, sir, your Honor. You're bringing up some valid points."

Flores also told Agent Thrash that "once he got the car, that he was told by Jorge that he was not to keep any directions with him on his person, any type of phone numbers with him. And he was supposed to go to a Texaco gas station off of Interstate 35 and Seminary Road up in Fort Worth. And then he was to call Paco." Flores had the telephone number for Paco on a scrap of paper in his car. Upon the court's inquiry, Agent Thrash stated that Flores had known Paco for about three years. The court seemed incredulous: "[Flores] doesn't know any more about his name than 'Paco?'" "And we have to presume that Paco is from Guanajuato. I mean, this is baloney." After further questioning from the government, Agent Thrash stated that he was able to verify the times Flores had indicated that he had crossed the border.

Obviously unsatisfied with the amount of information offered during Flores's debriefing, the court asked the government whether it was willing to allow Flores another opportunity for debriefing, and the government responded affirmatively. The court explained that:

> [W]e are at the Sentencing Hearing and I don't believe the story. And I'm willing to take it on my responsibility as a sentencing judge to give him the full deal of 120 months because this is a bunch of baloney. He would know Paco because Paco's got to be from Guanajuato. Because the chances of drugs being in Guanajuato where Paco lives and where he's from and the drugs just happen to be in Guanajuato is just like a lottery.

The government agreed to continue the sentencing hearing and conduct further debriefing. Prior to adjourning, the court asked Flores whether he understood what had just occurred, and he responded affirmatively.

At the second sentencing hearing, the government informed the court that Flores had given

5

the following information during further debriefing.  In addition to the instant load of cocaine, the government stated that Flores admitted he had transported two other loads.  Flores further gave first and last names of the involved individuals and the name of the street where Paco lived.  The government described this information as a "little better" but indicated that the court's concern with respect to drugs originating from Flores's hometown had not been addressed.  Nonetheless, the government conceded Celaya was "not a tiny town," but instead asserted that Celaya was a town of 80,000 people.  The government acknowledged that "[i]t would be possible for [Flores] to not know everyone in town, obviously, but it is a town deep in the interior of Mexico."  The government also acknowledged that the agent was able to verify the location of the Texaco station described by Flores.

The court then attempted to remember the reason it disbelieved Flores at the first sentencing hearing.  The government reminded the court that it had disbelieved that Flores did not know where Paco lived and that the transaction just "happened to be in his hometown, which was deep in the interior of Mexico."

Upon being reminded of its doubts about the completeness of Flores's story, the court engaged in a monologue illustrating its belief regarding the first encounter between Flores and Paco in Fort Worth.[3]  The court later reiterated that Paco and Flores would have discovered that they were

---

[3]

    I mean you can see the conversation over the pool table: "Hey, you know, want to play a game?"  "Sure, I'll play a game with you."  "What are you drinking?"  "I'll have a Bud.  How about you?"  "Yeah, I'll take a Bud.  Let's get a couple of longnecks and shoot a round.  How long you been here?"  "Oh, I've been here five or 10 years, how about you?"  "Oh, same time."  "Where are you from?"  "Mexico."  "Me, too."  "Where is your hometown?"  "Celaya."  "No, kidding!  That's where I'm from.  How old are you"  "Well, I'm so-and-so.  So, you know Joe?"  "No, I don't know Joe"  "Well, where do you live?"  "Well, I live over there on the west side of

both from Celaya.[4] Defense counsel interjected that Flores was "not actually from Celaya. He lives outside of Celaya a few miles in a small village." The court did not expressly acknowledge that statement.

The court asked the government whether it recommended the application of the safety valve based upon the second debriefing. The government responded that "[i]n speaking with the agent, she seemed to think that but for the same hometown part, it seemed pretty credible. So, I understand the Court's reservations about that. It seems like a huge coincidence. That's the only problem I have with it." Inexplicably, the court inquired: "How many people are there in Mexico?" To which the government responded "[i]t is a fairly populous country, your Honor." The Court continued: "Two

town, on Claremore Street." And where do you live?" "Well, I don't live on Claremore Street. I live on the other side of town. I live on Josephine Street."

Now that's the way conversations go between people when they are from the same town in a distant country.

"Well, anybody else up here from Celaya?" "No, well, I don't know. I hadn't seen anybody else, but it is sure good to see you. Why don't we get together and have drinks sometime. Married?" "No, I'm not married." "Got any kids?" "Yeah, I got kids." "Where do they go to school?"

All those same kind of conversations would happen in this case and he hasn't disclosed a one of them to you. Now, that's life. That's the way people are. Now, you tell me that's not so. Somebody tell me that the ordinary conversations in life wouldn't happen here. And if they didn't happen here, it's because of deliberate ignorance.

"Well, what business are you in?" "Well, I'm a drug smuggler. What business are you in?" "Well, me, too! But don't ask me any questions. That way if you get caught and I get caught, we don't have to talk to each other."

So I think we happen to have a poverty of knowledge here before the Court.

[4] "You are from Celaya?" "Me, too!"

7

hundred million? One hundred fifty million? One hundred million?" The government responded, in part: "It's over 100 million." The court reiterated its disbelief: "And two guys from Celaya end up in Fort Worth, and the other one doesn't know where he lives?"

The court again inquired whether the government recommended the application of the safety valve. The government responded that it was "going to recommend the safety valve simply because that was my original position. And it is possible that it's true--" The court reminded the government that its first recommendation for the safety valve was based upon incomplete information from Flores. After further exchange, the government, essentially echoing the court, stated that "the only problem with his story that I still find is the Celaya thing. It's a huge coincidence, and it would seem to me that when they were getting together, that before this person trusted him – although maybe he didn't know where he lived – that that would have been a big topic of conversations and who – if he knew so-and-so and if he knew his cousin down – you know– in maybe his town . . . ." The court made inquiry with respect to the ages of Flores and Paco.

The government then called DEA Agent Paulette Orajel.[5] Agent Orajel, a Spanish speaker, had also been present at the second debriefing. She testified that the additional information Flores provided was the "last name [Duran] of the two brothers in Celaya, Mexico; the full name of the contact in Fort Worth [Francisco "Paco" Martinez], a much [more] thorough description as well as what [Martinez] drove." Flores also "drew out a map as to where the Texaco station was and in relation to the Codefendant, Francisco Martinez's address." Flores told the agents that although Martinez had mentioned the name of his street ("Sandage")[6], he never provided a street address. Nor

_____

[5] Agent Thrash, who testified at the initial hearing, was on assignment out of state.

[6] The court reporter indicates that this is a phonetic spelling of the street name.

8

had Flores visited Martinez's home. Agent Orajel conducted a computer search but could not verify that a Francisco Martinez lived on that street. However, she was able to verify the location of the Texaco station Flores had discussed in relation to Sandage street.

Based on the second debriefing, Agent Orajel further related that Martinez provided Flores with $4,000 to buy the load vehicle. Flores purchased the vehicle for $3,200. Additionally, Flores informed the agents that he had "run two prior loads to this one, both [of] which were the same – to contact the brothers in Mexico and to deliver the vehicle to the Texaco station there on the corner of Seminary and 35." Flores was paid $4,500 for each trip. On this last trip, the Duran brothers in Celaya, Juan and Jorge Duran, paid him 700 pesos to make the trip.

Flores explained to the agents that he had a telephone number for the Duran brothers and would contact the brothers upon arrival in Celaya. He would then deliver the vehicle to them. Thereafter, Flores would stay at his mother's home. Flores indicated that the Durans did not know "where his mother lived, but they had the phone number. They would then contact him when the load vehicle was ready. He would then meet them, pick it up, and then drive to Fort Worth."

During the debriefing, the agents asked for the Durans' telephone number. Flores explained that Martinez had given him the number but he discarded it "so that he wouldn't be found with it."

On cross-examination, the agent testified that Flores also gave a description of Martinez's vehicle as a "Chevrolet Dual-E pickup truck, blue with Texas tags, two-door." Flores further gave the names of the bars (El Establo and Lupita's) that he and Martinez frequented together. Flores indicated that these bars were on the same street and near his neighborhood. Flores indicated during both debriefings that he had Martinez's telephone number on a piece of paper in his car. The agent testified that the paper was not found in Martinez's vehicle, and a discussion ensued with respect to

9

whether it was possible that the scrap of paper could have been lost after the vehicle was seized and cleaned. Defense counsel indicated to the court that "one of the problems here" was that Flores's personal property in the vehicle (including his wallet and identification papers), which had been seized, was missing. The court informed defense counsel that the "problem" was that Flores "didn't tell the DEA everything that he knew the first time around. And once you start that – once you go down the road of lying and not disclosing, then nobody knows where it ends, where your lies end."

Later, on cross-examination, Agent Orajel testified that she believed that Flores was "credible and forthright." The court asked whether the agent believed that Flores had provided *all* information and evidence concerning this offense. The agent responded that "I believe that the information he gave was credible. But since I was not the Case Agent, I wasn't able to review all of the evidence to see if I could basically catch him in a lie, see if he was not completely forthcoming with all the information."

Indicating that Flores might testify, the court asked defense counsel whether he wanted to provide an explanation why Flores had not given "any information concerning the Durans." Defense counsel initially responded that he would call his client to testify. After conferring with Flores, he informed the court that Flores did not want to testify. Ultimately, the court found as follows: "I'm not going to award safety valve. I still don't believe him. So he'll be sentenced to [the statutory minimum of] 120 months . . . ."

As previously set forth, Flores argues that the district court clearly erred in refusing to apply the safety valve provision based upon its speculation. Relying on *United States v. Miller,* 179 F.3d 961 (5th Cir. 1999), Flores contends that his application for the safety valve provision should not be defeated by mere conjecture that he must have had more information concerning the offense.

10

In *Miller,* the government argued that the appellant was not entitled to the safety valve provision because he had lied regarding his ability to process cocaine. 179 F.3d at 967.[7] We agreed with Miller's assertion that the government's argument was based upon speculation. *Id.* We found persuasive the First Circuit's reasoning in *United States v. Miranda-Santiago,* 96 F.3d 517 (1st Cir. 1996). In *Miranda-Santiago,* the First Circuit rejected as conjecture the contention that because the defendant had lived with other codefendants she had more information than she provided. 96 F.3d at 529. The First Circuit concluded that the sentencing court's "bare conclusion" that the defendant had not cooperated fully, "absent either specific factual findings or easily recognizable support in the record, cannot be enough to thwart her effort to avoid imposition of a mandatory minimum sentence." *Id.* at 529-30. In *Miller,* we also recognized that the First Circuit later clarified its holding in *Miranda-Santiago* by explaining that:

> *Mianda-Santiago* in no sense suggests that the sentencing court cannot arrive at an independent determination regarding a criminal defendant's truthfulness, based on the evidence before it. Rather, we there held merely that it was clear error to conclude that the defendant had been untruthful, based solely on a PSR which directly contradicted the district court's determination.

179 F.3d at 968 (quoting *United States v. White,* 119 F.3d 70, 74 (1st Cir. 1997)).

This Court then stated that the government's assertion that Miller was untruthful regarding his knowledge of processing cocaine was based merely on the fact that the process was complex and that Miller previously had trafficked in cocaine. We found that in view of the fact that there was *nothing* in the record to contradict Miller's assertions to the probation officer contained in the PSR,

---

[7]    This Court first determined that because the alleged lies concerned irrelevant prior activities, the alleged lies  would have no "impact" on the safety valve determination. *Id.* at 968. Nonetheless, "[f]or the sake of completeness," we addressed the government's argument. *Id.*

11

the government's assertion was "merely speculative." *Miller*, 179 F.3d at 969. We therefore held that the district court erred in refusing to grant the safety valve relief and vacated for resentencing.

Unlike in *Miller,* the record in the instant case demonstrates that the court did not deny the safety valve application based merely upon speculation. It is undisputed that Flores provided additional information at his second debriefing. Accordingly, at the initial hearing, the district court correctly determined that, contrary to the apparent belief of the government and defense counsel, Flores had not provided all the information he had with respect to the instant offense. As the district court explained to defense counsel at the second hearing, there was a "problem" because Flores "didn't tell the DEA everything that he knew the first time around. And once you start that – once you go down the road of lying and not disclosing, then nobody knows where it ends, where your lies end." Additionally, the district court's conclusion that Flores was withholding information with respect to the Duran brothers is supported by Flores's admission that the instant transaction was the third time he had transported drugs for the Durans.[8]

In view of the above evidence supporting the district court's conclusion, and because Flores had the burden of demonstrating that he had truthfully provided all relevant information, we are unpersuaded that Flores has shown the district court's finding was clearly erroneous.

---

[8] We do not rely upon the district court's reasoning that simply because Flores and the drugs originated from the same general area in Mexico Flores must have had more information than he provided. In 1990, Celaya had a population of 214,856, and the city of Guanajuato had a population of 73,108. The Columbia Encyclopedia 505 & 1198 (6th ed. 2000). The size of these cities persuade us that, even assuming *arguendo* all the parties involved are from Celaya, the district court's belief that Flores necessarily would have more information is based upon speculation.

Accordingly, we AFFIRM Flores's conviction and sentence.[9]

---

[9] Finally, Flores argues, for the first time on appeal, that subsections (a) and (b) of 21 U.S.C. § 841 are facially unconstitutional. More specifically, he contends that the statute's assignment of penalties based upon the types and quantities of controlled substances is facially unconstitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000). Flores concedes that his argument is foreclosed by our decision in *United States v. Slaughter*, 238 F.3d 580 (5th Cir.2000), and raises it only to preserve it for possible further review.