**UNITED STATES of America,**
**Appellee,**

v.

**Wendy REYNOSO, a/k/a Cathy Altagracia, a/k/a La Rubia,**
**Defendant–Appellant.**

**No. 00–1159.**

United States Court of Appeals, Second Circuit.

Argued Aug. 10, 2000.

Decided Dec. 27, 2000.

Frederick H. Cohn (Laura K. Gasiorowski, on the brief), New York, NY, for Defendant-Appellant.

Marc L. Greenwald, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney, and Andrea L. Labov, Assistant United States Attorney, on the brief), for Appellee.

Before CALABRESI, CABRANES, and POOLER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Section 3553(f) of Title 18 provides that, for certain specified offenses, a court "shall" sentence a defendant "without regard to any statutory minimum sentence" if, *inter alia*, "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense." 18 U.S.C. § 3553(f)(5). The question presented in this appeal, apparently as a matter of first impression, is whether a defendant who provided *objectively* false information to the Government nevertheless satisfies the requirement set forth in § 3553(f)(5) if he or she *subjectively* believed the information provided to the Government was true.

The question arises on appeal from a judgment of the United States District Court for the Southern District of New York (Denny Chin, *Judge* ), convicting defendant Wendy Reynoso, following a guilty plea, of distributing and possessing with intent to distribute more than five grams of crack cocaine and sentencing her principally to the statutory minimum of 60 months' imprisonment. We agree with the District Court that because Reynoso provided the Government with objectively false information, she does not qualify for the so-called "safety valve" of § 3553(f). Accordingly, we affirm the judgment of the District Court.

I.

The facts relevant to this appeal are essentially undisputed. On July 8, 1998, officers and agents of the High Intensity Drug Task Force, a joint task force of the New York City Police Department ("NYPD") and the United States Drug Enforcement Administration, were conducting an investigation in the area of Broadway and 151st Street in Manhattan. As part of that investigation, a confidential informant ("CI") approached an unidentified male and arranged for Ricky Nesmith, an undercover NYPD detective, to purchase 62 grams of crack cocaine. The CI and Detective Nesmith then took a livery taxi to 605 West 151st Street, where the unidentified male had indicated to the CI that the crack cocaine would be delivered.

Soon after the CI and Detective Nesmith arrived at 605 West 151st Street, Reynoso approached the car. Following a conversation with the CI, Reynoso then left. A short time later, however, she returned carrying a brown bag, and handed the bag, which turned out to contain approximately 44 grams of crack cocaine, to the CI. Reynoso told the CI that there were only 45 grams of crack cocaine in the

bag, and instructed the CI and Detective Nesmith that because of police activity in the area they should return later for the remaining 17 grams. Reynoso was arrested almost five months later, on December 7, 1998, and charged in a two-count indictment with conspiracy to distribute and possess with intent to distribute more than fifty grams of crack cocaine, in violation of 21 U.S.C. § 846; and distribution and possession with intent to distribute more than five grams of crack cocaine, in violation of 21 U.S.C. § 812, 841(a)(1), and 841(b)(1)(B).

On August 13, 1999, Reynoso met with prosecutors for a so-called "safety valve proffer." At the meeting, Reynoso informed the Government that she had been addicted to drugs at the time she distributed the crack cocaine to Detective Nesmith. Although she acknowledged distributing the crack cocaine, Reynoso nevertheless denied having served—on July 8, 1998 or on any other date—as a courier or deliverer of drugs for a Washington Heights drug dealer. Instead, Reynoso steadfastly maintained that she had stolen the crack cocaine at issue from a nearby billiards parlor and that she then had approached the first car she saw to sell the drugs. As Reynoso's counsel concedes, "The objective facts known to the parties did not support Ms. Reynoso's story.... The only logical inference [from the known facts] is that Ms. Reynoso was working for a drug dealer as a courier, not that she had stolen the crack and sold it herself." Brief of Appellant at 6.

Because Reynoso continued to deny having served as a courier or distributor, despite the known facts to the contrary, defense counsel retained Dr. Mark Mills, a forensic psychiatrist, to examine Reynoso. After Dr. Mills briefly examined Reynoso in jail and reviewed the case materials, he reported his findings to defense counsel in September 1999. Dr. Mills concluded that Reynoso had no "psychiatric illness," nor any "major psychiatric issue[s]." Nevertheless, after reviewing Reynoso's accounts of neglect and drug use during her childhood and adolescence, Dr. Mills opined:

> [Reynoso's] history of intoxication, impaired memory and neglect accounts for her behavior at her proffer session. While she was ready to accept responsibility for her criminal behavior, she unconsciously elaborated, the technical term is "confabulated[,]" a story that would account for her behavior given the highly incomplete recollection that she had. Expressed differently, Ms. Reynoso told something that was untrue, *but did not appreciate that it was untrue* because of her organic memory impairment, secondary to cocaine intoxication. Such a pattern of confabulation is common in those with significant organic memory impairment.

(emphasis added).

On October 6, 1999, Reynoso pleaded guilty to Count Two of the indictment—for distribution and possession with intent to distribute more than five grams of crack cocaine. Thereafter, armed with Dr. Mills's report, Reynoso's counsel made a motion pursuant to the safety valve provision of § 3553(f) for relief from the mandatory minimum sentence of 60 months' imprisonment. Defense counsel conceded that Reynoso had not been "[o]bjectively" truthful at her safety valve proffer, but argued that she nevertheless satisfied § 3553(f)(5)—which, as noted, requires that "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense"—because "she did not appreciate the fact that her information was untrue [as a result] 'of organic memory impairment, secondary to cocaine intoxication.'" In opposing the motion, the Government did not contest that Reynoso satisfied the other four requirements for relief under the safety valve provision [1] or challenge

---

1. The other four requirements for relief under the safety valve provision are as follows:

the findings of Dr. Mills.[2] Instead, the Government argued that Dr. Mills's findings were irrelevant as a matter of law and that Reynoso could not satisfy § 3553(f)(5) because the information she had provided was "objectively untruthful."

Following oral argument, the District Court denied Reynoso's motion for relief from the mandatory minimum sentence in a ruling from the bench. The District Court agreed to assume *arguendo* that Dr. Mills's findings were valid and that Reynoso "genuinely believes that she was telling the truth." Nevertheless, the District Court concluded, primarily as a matter of plain language and of "policy," that Reynoso did not satisfy the requirement of § 3553(f)(5) because she had provided objectively false information to the Government. Accordingly, the District Court sentenced Reynoso to the statutory minimum of 60 months' imprisonment, followed by four years' supervised release, and imposed a mandatory special assessment of $100. This appeal followed.

## II.

The sole question on this appeal is whether Reynoso qualifies for relief under the safety valve statute. The parties agree that this question turns on whether Reynoso satisfies the fifth requirement of the statute, which provides that

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in

that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f)(5); *accord* U.S.S.G. § 5C1.2(5) (incorporating the same requirement). Reynoso, who bears the burden of proving that she qualifies for safety valve relief, *see, e.g., United States v. Ortiz,* 136 F.3d 882, 883 (2d Cir.1997), argues that § 3553(f)(5) requires only that a defendant "subjectively believe[ ]" information provided to the Government is true. In response, the Government contends that the provision requires a defendant to show that the information he or she provided was objectively true. The proper construction of the statute is a question of law, subject to *de novo* review. *See, e.g., United States v. Tang,* 214 F.3d 365, 370 (2d Cir.2000).

We conclude that Reynoso and the Government are both partially correct—that is, that a defendant seeking to qualify for relief under the safety valve provision must prove *both* that the information he or she provided to the Government was objectively true *and* that he or she subjectively believed that such information was true. This conclusion is supported, first and foremost, by the plain language of § 3553(f)(5). *See, e.g., United States v. Piervinanzi,* 23 F.3d 670, 677 (2d Cir.1994) ("[T]he starting point for interpreting a statute is the language of the statute itself." (internal quotation marks omitted)); *cf. United States v. Ron Pair Enters.,*

> the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise....
> 18 U.S.C. § 3553(f).

**2.** Because the Government has accepted Dr. Mills' findings, for purposes of this appeal we assume, as did the District Court, that Reynoso subjectively believed that she had truthfully provided all the information she had.

*Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." (internal quotation marks and brackets omitted)). As noted, § 3553(f)(5) states that a defendant qualifies for relief only by "*truthfully* provid[ing] to the Government all information and evidence [he or she] has concerning the offense." 18 U.S.C. § 3553(f)(5) (emphasis added). One authority defines "truthful" as both "telling or disposed to tell the truth" and "accurate and sincere in describing reality." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2457 (1976). Other dictionaries similarly define the word to encompass both a subjective belief in the truth of information conveyed *and* the conveyance of true information. *See, e.g.,* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1378 (1970) ("1. Consistently telling the truth, honest. 2. Corresponding to reality: true."); THE RANDOM HOUSE COLLEGE DICTIONARY 1612 (1973) ("1. telling the truth, esp. habitually .... 2. conforming to truth .... 3. corresponding with reality...."); WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1964 (2d ed.1983) ("1. telling the truth; presenting the facts; veracious; honest. 2. corresponding with fact or reality, as an artistic representation." ). We see no reason to believe that Congress did not intend for the word "truthfully" in § 3553(f)(5) to encompass both these meanings. Accordingly, we hold that in order to qualify for safety valve relief, a defendant must prove both that the information he or she provided to the Government was objectively true

and that he or she subjectively believed that such information was true.

Reynoso and our dissenting colleague emphasize that the statutory language is "truthfully provided" rather than "truthful information," and would have us infer from Congress's use of an adverb that "the emphasis in the statute is on the defendant's state of mind," Brief of Appellant at 21; *see post* at 150, but we are unpersuaded. In previous cases concerning § 3553(f)(5), we have, except when quoting the statute itself, almost without fail used the adjective "truthful" when articulating the standard to be applied.[3] *See United States v. Schreiber*, 191 F.3d 103, 106 (2d Cir.1999) (holding that § 3553(f)(5) requires that a defendant provide "to the government complete and truthful information no later than the time of sentencing"); *United States v. Conde*, 178 F.3d 616, 620 (2d Cir.1999) (stating that § 3553(f)(5) requires "truthful and complete disclosure to the government"); *United States v. Smith*, 174 F.3d 52, 55 (2d Cir.1999) (stating that safety valve relief is contingent on disclosure of "complete and truthful information"); *United States v. Cruz*, 156 F.3d 366, 371 (2d Cir.1998) (stating that § 3553(f)(5) requires "that a defendant provide truthful information regarding the 'offense of conviction and all relevant conduct' "); *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir.1997) ("[T]he plain language of the 'safety valve' places the burden on the defendant to provide truthful information to the government."). *But see id.* at 1111 ("Catalano failed to meet his burden of proving that he had truthfully provided all the information available to him."). This consistent usage, considered in conjunction with both the dictionary definitions of the term "truthful" quoted above and the ordinary, common-sense

---

**3.** In referring to these cases, we do not mean to suggest, as our dissenting colleague would have it, that this Court has previously decided the question before us, even "subconsciously," *post* at 151. Rather, we mean to demonstrate that this Court has placed little significance on the distinction between "truthfully provided" and "truthful information." We

are also less willing than the dissenter to dismiss the plain language of these opinions as "off-hand judicial rewriting" or to speculate that our colleagues were motivated, not by reasoned conviction, but rather by a desire to avoid the grammatical *"faux pas"* of split infinitives. *Post* at 151 n. 1.

meaning of the word, *see, e.g., Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."), leads ineluctably to the conclusion that Congress intended no legal significance to attach to its use of the words "truthfully provided" rather than "truthful information."

Our conclusion, that § 3553(f)(5) requires both that information provided to the Government be objectively truthful and that a defendant subjectively believe that such information is truthful, is further supported by the legislative history and purposes of the safety valve provision. The legislative history of the Mandatory Minimum Sentencing Reform Act of 1994 ("MMSRA"), Pub.L. No. 103–322, tit. VIII, § 80001(a), 108 Stat. 1796, 1985–86, which contained the safety valve provision, indicates that one of the principal purposes of the statute was to reform the then "current operation of mandatory minimums [under which] mitigating factors that are recognized in the [sentencing] guidelines and generally are considered in drug cases do not apply to the least culpable offenders except in rare instances." H.R.Rep. No. 103–460, at 3 (1994), *reprinted at* 1994 WL 107571. As we have explained, Congress intended "to remedy an inequity in the old system, which allowed relief from statutory minimum sentences" to those defendants who rendered "substantial assistance" to the Government— usually higher-level offenders, "whose greater involvement in criminal activity resulted in their having more information"— but effectively denied such relief to the least culpable offenders, who often "had no new or useful information to trade." *Cruz,* 156 F.3d at 375 (quoting *United States v. Arrington,* 73 F.3d 144, 147–48 (7th Cir. 1996)).

The critical point to draw from this legislative history is that Congress, in enacting the MMSRA, was concerned about the low-level figure in a drug conspiracy who sought to provide the Government with substantial assistance but, by virtue of his or her minor involvement in the criminal activity, "had no new or useful information to trade." *Id.* Thus, Congress intended to provide relief from statutory minimum sentences to those defendants who, *but for their minor roles in criminal activity,* could (and would) have provided the Government with substantial assistance. To be sure, because a defendant may get safety valve relief even when the information provided is neither "new" nor "useful," *see* 18 U.S.C. § 3553(f)(5) ("[T]he fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination . . . that the defendant has complied with this requirement."), the Government cannot legitimately claim an entitlement under § 3553(f)(5) to information of value. *See, e.g., Schreiber,* 191 F.3d at 108. However, aided by the legislative history, we read the statute to mean that the Government is entitled under § 3553(f)(5) *not* to be provided with objectively false information, which may well be harmful to the Government. Indeed, we are confident that, in enacting the MMSRA, Congress did not intend to reward the defendant who, for whatever reason, tries "to trade" on objectively false information. *Cruz,* 156 F.3d at 375. Similarly, because Congress was concerned primarily with "the least culpable offenders," H.R.Rep. No. 103–460, at 3, we conclude that a defendant must subjectively believe he or she is providing truthful information in order to qualify for safety valve relief.

Reynoso makes two arguments in reliance on the case law concerning § 3553(f)(5), but both are without merit.[4]

---

4. In addition to the two arguments discussed below, Reynoso also suggests that the District Court's construction of § 3553(f)(5) conflicts with the law concerning mental competence to stand trial. *See* 18 U.S.C. § 4241. However, Reynoso did not make this argument until

First, Reynoso contends that a defendant "need only make a good faith effort to cooperate" in order to qualify for safety valve relief. Brief of Appellant at 22 (citing *United States v. Shrestha,* 86 F.3d 935, 938 (9th Cir.1996)). It is true "that we have previously suggested that the statute requires a defendant to 'cooperate' with the government, and to do so in 'good faith.'" *Schreiber,* 191 F.3d at 106 (citations omitted) (quoting *Cruz,* 156 F.3d at 375, and *Gambino,* 106 F.3d at 1110, respectively). However, we have never suggested that whether a defendant satisfies the statutory requirement of "truthfully provid[ing] ... all information and evidence" turns solely on the defendant's state of mind. In fact, in *Ortiz,* we held that a defendant's mere willingness to provide complete and truthful information to the Government is insufficient for relief; as we explained, the statute requires a defendant *actually* to provide such information. *See* 136 F.3d at 884. Similarly, in *Schreiber,* we held that under the plain language of § 3553(f)(5) a defendant may qualify for safety valve relief so long as he or she "volunteer[s] to the government complete and truthful information no later than the time of sentencing"—even if he or she had repeatedly lied to the Government before telling the truth. 191 F.3d at 106. At the threshold, therefore, a defendant must provide the Government with complete and *objectively* truthful information in order the qualify for safety valve relief; the defendant's *subjective* reasons for failing to comply with this requirement are simply immaterial. *Cf. Tang,* 214 F.3d at 370–71 (rejecting the defendant's argument that "he should be excused for refusing to give information about a particular co-conspirator ... based on his fear for

the safety of his fiancee and family members").

Second, Reynoso relies on our sister circuits' decisions in *United States v. Sherpa,* 110 F.3d 656 (9th Cir.1997), and *United States v. Thompson,* 76 F.3d 166 (7th Cir. 1996), but this reliance is misplaced. Loose language aside, these cases are distinguishable on either the law or the facts (as even the dissent implicitly concedes at least with respect to *Sherpa*). *Sherpa* concerned only the question of whether a sentencing court "may reconsider facts necessary to the jury verdict in determining whether to apply the safety valve provision." 110 F.3d at 662. Nothing in the opinion suggests that the panel of the Ninth Circuit considered, let alone decided, whether § 3553(f)(5) may be satisfied even when a defendant has provided the Government with objectively false information. In *Thompson,* on the other hand, the defendant did, in fact, provide the Government with objectively truthful information. *See* 76 F.3d at 170 ("[U]pon her arrest, Thompson provided a statement setting forth her actions in transferring packages and dealing with large amounts of cash ... thus acknowledging her objective conduct."); *id.* at 171 ("Prior to sentencing, Thompson provided the government all information and evidence she had concerning the offense."). Insofar as the Court of Appeals for the Seventh Circuit considered the "limitations on Thompson's perceptual and analytical abilities," *id.* at 171, the Court appears to have done so in order to assess whether Thompson provided the Government with *all* the information to which she had access, not whether she subjectively believed that the information was truthful. In any event, to the extent that *Sherpa* and *Thompson* are arguably on point and support Reynoso's construc-

---

her reply brief, let alone raise the issue of her competence to stand trial before the District Court (to the contrary, Dr. Mills stated explicitly in his report that Reynoso had "the requisite capacity to cooperate with [defense counsel], to evaluate her present circumstances and to enter a plea," and "[w]e repeatedly have said that we will not consider conten-

tions first advanced at such a late stage.") *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142–43 (2d Cir.1999) (citing cases). Accordingly, we decline to consider Reynoso's argument here. In any event, neither law nor logic suggests that our interpretation of § 3553(f)(5) has implications for the law concerning mental competence to stand trial.

tion of § 3553(f)(5)—propositions that we believe are unsustainable based on reasonable interpretations of the Courts' opinions—we conclude that the cases are wrongly decided and decline to follow them.

## III.

In sum, we hold that a defendant may not qualify for safety valve relief under 18 U.S.C. § 3553(f) without proving both that information he or she provided to the Government was objectively true and that he or she subjectively believed that such information was true. Because Reynoso concedes that the information she provided to the Government was objectively false, she is not entitled to relief under the safety valve provision. Accordingly, the judgment of the District Court is affirmed.

CALABRESI, Circuit Judge, dissenting:

This case presents the question of whether 18 U.S.C. § 3553(f)(5)—which requires a defendant to prove that she has "truthfully provided to the Government all information and evidence [she] has" in order to obtain "safety valve" relief from a statutory minimum sentence—employs an objective or a subjective standard of truthfulness. Put otherwise, we are called upon to determine whether a defendant who provides information that she believes to be true has met the requirements of § 3553(f)(5) and is eligible for safety valve relief, even though the data she gives is objectively false. The majority has determined that she is not. Because I believe that the majority's reading of the safety valve provision finds no support (a) in its language when read according to the most elementary rules of grammar, (b) in prior cases interpreting that language, or (c) in the provision's legislative history, I respectfully dissent.

## I.

As with all matters of statutory interpretation, we begin with the language of the statute. *See United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir.1994). Although the majority claims to have analyzed what § 3553(f)(5) says, *see ante* at 146–47, it does not actually respect the provision's plain language. Section 3553(f)(5) requires that a defendant who has otherwise met the "safety valve" criteria "truthfully provide[ ] to the Government all the information and evidence the defendant has." The majority interprets this sentence to mean that a defendant must prove *both* "that the information he or she provided to the Government was objectively true and that he or she subjectively believed that such information was true." *Ante* at 150. But § 3553(f)(5) in fact says nothing about the veracity of the information a defendant gives; it requires only that the defendant provide information that she believes to be true.

The majority's interpretation treats the provision as if it stated that the defendant must "truthfully provide[ ] to the Government all the *truthful information* ... the defendant has." The majority attempts to avoid the problem that the statutory language creates for its interpretation by treating the word "truthfully" both as an *adverb* modifying the verb "provide[ ]" (which it is) and as an *adjective* modifying the noun "information" (which it is not and grammatically cannot be).

It is, in other words, obvious that the provision as it is written (not as the majority might wish it to be) contains no requirement that the information provided comport with the facts of the case as the court finds them to be. Rather, the provision requires that the defendant "truthfully provide[ ] all the information ... [she] has." She must, that is, make *"a good faith attempt* to cooperate with the authorities." *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir.1997) (discussing defendant's safety valve proffer pursuant to § 3553(f)5). And the placement and form of the word "truthfully" unmistakably indicates that it is the defendant's state of

mind rather than the quality of the information that is at issue.

Further evidence that this is the proper reading of the statute can be found in the remainder of the provision: A defendant must truthfully provide "all the information *the defendant has.*" 18 U.S.C. § 3553(f)(5) (emphasis added). I cannot see how someone *has* information that she does not know about. As a result, when the government, remarkably, conceded that Reynoso genuinely believed what she said, it also necessarily conceded that she had *truthfully provided the evidence she had.* And this remains so even though the evidence she gave is not true.

The majority's opinion is thus doubly wrong linguistically: Not only does the grammatical structure of the statute make it clear that the relevant issue is the defendant's state of mind, but so too does the language requiring her to provide all the information she has. One need not be a philologist to conclude that a person *has* no information that for whatever reason, mental or otherwise, she is *conceded not to have.*

## II.

Moreover, neither the majority's lengthy citation of cases that have mentioned "truthful information," *see ante* at 147–48, nor its reliance on the provision's legislative history, support—and certainly do not justify—its misreading of the plain language of the statute. It is true that if § 3553(f)(5) had required a defendant to "provide truthful information," the majority's reading would be correct. It is also true that some of our cases have, in passing, treated the provision as if it so read. But the majority takes the phrase "truth-

ful information" in those cases completely out of context.

In none of the cases the majority cites was the courts' rewriting of the sentence in any way relevant, let alone necessary, to their results, and so such judicial rewriting is of no significance.[1] *See United States v. Schreiber,* 191 F.3d 103, 106 (2d Cir.1999) (holding that a defendant who had initially lied to the Government but then provided "truthful information" "no later than the time of the sentencing" was eligible for safety valve relief); *United States v. Conde,* 178 F.3d 616, 621 (2d Cir.1999) (using the language of "truthful ... disclosure" but holding that there was no inconsistency in the district court's granting defendant a three-step reduction in his guidelines offense level on account of his acceptance of responsibility while at the same time refusing to grant him safety valve relief); *United States v. Smith,* 174 F.3d 52, 56 (2d Cir.1999) (using the language of "truthful information" and holding that safety valve relief was inapplicable where defendant "willfully chose not to speak with any investigatory body so as not to implicate his brother"); *United States v. Cruz,* 156 F.3d 366 (2d Cir.1998) (using the language of "truthful information" but holding that the safety valve provision does not violate the Fifth Amendment); *Gambino,* 106 F.3d at 1110 (using the language of "truthful information" but affirming the district court's denial of safety valve relief where defendant "incredibly" claimed that he had not been involved in much of the conduct the government had proven). There is, in fact, not a shred of evidence that the question now before us was even subconsciously in the minds of the courts deciding the cases cited above. It follows that their modifications of the statutory language have no bearing on our decision here.[2]

---

1. As I struggle in this opinion to avoid splitting infinitives as I discuss how defendants are required by the statute to "truthfully provide[ ]" information, it occurs to me that at least some of the off-hand judicial rewriting of the clause in these cases may have resulted from no more than an understandable, if

slightly dated, desire to avoid this grammatical *faux pas.*

2. Cases in which this court has utilized the actual language of the statute—that the defendant "truthfully provide" information to the Government—are, of course, also legion.

In addition, there are also cases in which we have used language clearly indicating the importance of the subjective perception of defendants. Thus, in *Gambino*, 106 F.3d at 1110, the court said, "A defendant must demonstrate to the court that he has made a good faith attempt to cooperate with the authorities"—a statement that certainly suggests that subjective knowledge (good faith) is key to the safety valve. And in *Schreiber*, 191 F.3d at 106, we emphasized that the statute requires that the defendant cooperate in good faith.

More important, the only appellate cases that have directly focused on the issue before us have rejected the majority's position. The majority has made a half-hearted effort to distinguish these decisions of our sister circuits. But, in the end, it declines to follow them. *See ante* at 150 ("In any event, to the extent that [*United States v. Thompson*, 76 F.3d 166 (7th Cir. 1996) and *United States v. Sherpa*, 110 F.3d 656 (9th Cir.1997) ] are arguably on point and support Reynoso's construction of § 3553(f)(5) . . . we conclude that the cases are wrongly decided and decline to follow them.").[3]

Of the two cases, *Thompson* is more directly germane. In both *Thompson*, 76 F.3d 166, and the instant case, the question is the same: What information did the defendant actually have, given the "limitations on [her] perceptual and analytical abilities." *Id.* at 171. Thompson received safety valve relief when she provided objectively false information that the court found she subjectively believed. As in the case before us, a psychologist evaluated the defendant. The expert found "a di-

minished capacity to understand complex situations." *Id.* at 168. The court stated that Thompson "gave the government information as she knew it and as she understood it." *Id.* at 170. The Seventh Circuit accepted the district court's reliance "on expert testimony presented at the sentencing hearing concerning limitations on Thompson's perceptual and analytical abilities and conclu[sion] that Thompson was forthright within the range of her ability." *Id.* at 171.

The same is true of this case. Reynoso was convicted of distributing and possessing with intent to distribute crack cocaine to an undercover police detective. Throughout her safety valve proffer, she consistently maintained that she believed she had stolen the drugs that she gave to the undercover detective. Dr. Mark Mills, a forensic psychiatrist retained by Reynoso's counsel, testified that Reynoso's

> history of intoxication, impaired memory and neglect accounts for her behavior at her proffer session. While she was ready to accept responsibility for her criminal behavior, she unconsciously elaborated, the technical term is "confabulated" a story that would account for her behavior given the highly incomplete recollection that she had. Expressed differently, Ms. Reynoso told something that was untrue, but *did not appreciate that it was untrue* because of her organic memory impairment, secondary to cocaine intoxication. Such a pattern of confabulation is common in those with significant memory impairment.

And, in fact, many of the cases the majority cites have used the two phrases ("truthfully provide[ ]" and "truthful information") interchangeably. *See, e.g., Conde*, 178 F.3d at 621 (discussing "[t]he requirement that a defendant truthfully disclose to the government all information and evidence the defendant has") (internal quotation marks omitted); *Smith*, 174 F.3d at 54, 56 (repeatedly using "truthfully provide[ ]" language); *Gambino*, 106 F.3d at 1111 (agreeing with the district court that defendant had "failed to meet his burden of

proving that he had truthfully provided all the information available to him").

3. Of course, the majority can with complete propriety decide not to follow the reasoning of other circuits with which it does not agree. I mention the opinions of those circuits simply to note that some distinguished courts have, seemingly, favored the reading that I would give to the provision, and to point out the apparent creation of a circuit split on the issue.

(emphasis added). Like Thompson, then, Reynoso "was forthright within the range of her ability." *Id.* at 171. As a result, she provided the government all of the information she possessed. (Indeed, the government has *conceded* as much.) That is all the plain language of § 3553(f)(5) requires.

### III.

The majority attempts to justify its deviation from the plain meaning of the statute by reference to the legislative history of § 3553(f). It argues that that history provides only one legitimate justification for a defendant's failure to have (and hence to be able to give) information about the offense: the defendant's limited role. *See ante* at 148. The majority also reads into the legislative history a government entitlement "*not* to be provided with objectively false information." *Ante* at 148 (emphasis in original).

In fact, the legislative history indicates neither such entitlement, nor any other support for the majority's interpretation. Rather, that history, as is often the case, is inconclusive. Most likely, all it shows is that Congress did not really think about the issue. But, if anything, it cuts against the majority view.

The principal goal behind the safety valve provision was undoubtedly to remedy the irony that "for the very offenders who most warrant proportionally lower sentences—offenders that by guideline definitions are the least culpable—mandatory minimums generally operate to block the sentence from reflecting mitigating factors." H.R.Rep. No. 103–460, at 3 (1994), *reprinted at* 1994 WL 107571. Ordinarily, downward departures that are grounded in cooperation with the police, because they are based on *substantial* assistance being given to the Government, require that the defendant provide useful information that the Government does not already possess, 18 U.S.C. § 3553(e), U.S.S.G. § 5K1.1. The safety valve provision was enacted to benefit defendants even if they "had no new or useful information to trade." *Cruz,* 156 F.3d at 375. It would seem to follow that defendants may be eligible for safety valve relief regardless of whether they have useful knowledge, useless knowledge, wrong knowledge, or no knowledge at all.

This object of the provision—to ensure proportionality in sentencing for "the least culpable offenders" and provide incentives for them to tell all they know—does not militate in favor of any particular interpretation of the language at issue in the instant case. On the one hand, it is not out of the question that the Government might also hope to gain useful information as a result of safety valve proffers by minor participants. To that extent, the provision of true information might be desirable. On the other hand, the obtaining of information, and hence its quality—whether it is true or false, helpful to future prosecutions or not—is beside the point of the statute.

In this respect, the safety valve is totally different from § 5K1.1, which is designed to obtain substantial assistance for the Government. Such assistance is, instead, expressly *not* the point of the safety valve. Thus Reynoso argues that

> [i]f the statute is meant to benefit low-level defendants who have tried to cooperate, but have failed to offer anything of value, it makes little sense to exclude from the statute's purview those defendants, who, despite their "best efforts," cannot offer objectively correct, or true, information because of faulty memory, mistake, or inability to perceive the "untruth" of their perceptions. If a defendant can qualify for the ... reduction by honestly professing his ignorance of any information, ... how can the court deny safety valve consideration to the defendant who honestly proffers mistaken information?

This argument remains valid in the face of the majority opinion. And the legislative history of the provision does not in any way undercut it or justify the majority's

departure from the natural meaning of the statute.

## IV.

Underlying the majority's refusal to read § 3553(f)(5) as it is written is a prediction that, under a subjective interpretation, defendants will be "reward[ed]" for "'trad[ing] on' objectively false information," *ante* at 148. This reflects a fear that allowing those like Reynoso, who profess to believe false information, to benefit from safety valve relief will lead to a mare's nest. As the Government states in its brief: "Permitting such a class of persons to receive the safety valve's benefit could mire district courts in a search for the intent behind a defendant's proffer of information when such information is not in fact truthful but the defendant contends his or her perception is sincerely held." Thus far, the Government continues, courts "'have found it fairly easy to cull serious efforts at full disclosure from mere pretense.'" Brief for Appellee at 18 (quoting *United States v. Montanez*, 82 F.3d 520, 523 (1st Cir.1996)). "Permitting the result advocated by Reynoso would drastically change the courts' abilities in this regard, inviting frequent battles between experts, and rendering a court's fact finding mission exponentially more difficult." The majority, like the Government, is understandably worried about defendants who might take advantage of a reversal in this case to gain safety valve relief without providing truthful information. Lying, the majority warns, "may well be harmful to the Government." *Ante* at 148.

Two considerations suggest that these fears are misguided. First, the district courts are already involved in determinations of the credibility of defendants' proffers. *See Schreiber*, 191 F.3d at 107 (discussing the importance of the defendant's credibility to the determination); *Gambino*, 106 F.3d at 1111 (describing how the district court based its denial of the safety valve motion on "the detailed representations in the government's letter, which the

court credited over [defendant's] implausible arguments in rebuttal"). As a result, allowing defendants who provide subjectively believed but objectively false information to receive safety valve relief does not suddenly inject credibility determinations where they have never been required in the past. The fact is, moreover, that defendants willing to lie can, under the majority's own holding, readily take advantage of the safety valve by credibly denying that they have any knowledge at all. This is so since, as all seem to concede, under the safety valve (a) a defendant can say that she thought that she had gotten the drugs in a particular way but frankly couldn't remember, and (b) her lack of memory, if truthfully held, would be a defense. Hence, rather than avoiding credibility fights, all the majority does is to create a perverse incentive to deny knowledge of uncomfortable facts.

Nor are the credibility determinations that must be made in such cases any easier than those to be made in the case before us. To the contrary, they present much the same problems as those the majority fears. As a result, the principle effect of the majority's interpretation is to create the need for Ptolemaic cycles and epicycles to enable courts to distinguish cases of lack of information due specifically to the minor role played by the defendant in the offense, from those due to lack of memory of the offense, and finally from those that, as in the instant case, are due to self-deluding false information.

Second, and more important, one can readily meet the majority's concerns altogether by establishing an overwhelmingly strong presumption that defendants are not truthfully providing all the information that they have when the information given is, in fact, not true. One could even go so far as to say that it is very hard to imagine, absent a concession like the one made by the government in this case, that an argument of this sort could ever work. Such a statement would not only be more than enough to avoid the problems the

district court fears but it would limit the availability of the safety valve to cases as extreme as the one before us, in which the government is itself willing to concede the defendant's honest belief in the veracity of the false information she has given.

Operating under a strong presumption that what is objectively true is subjectively believed is by no means unusual in criminal law. A defendant who truly believes that that which she held to the head of her victim was a banana and not a gun has a defense, based on an absence of *mens rea*, to a charge of murder or criminal assault. Nevertheless, it is almost impossible, and properly so, for a defendant to demonstrate the truth of that assertion because we assume, with an overwhelming degree of certainty, that everybody knows the difference between a banana and a gun. And so such a defense is virtually never even attempted. (I suppose that to make it out a defendant would have to show that all her life, she tried to peel and eat guns and shoot bananas.)

The defense, moreover, is never used despite the fact that criminal law places a very heavy burden on the government to prove, beyond a reasonable doubt, that the defendant in fact *actually* knew that what she was brandishing was a gun rather than a banana. Instead, in safety valve determinations, the burden rests on the *defendant* to produce persuasive evidence that she has truthfully provided all the information she has. It follows that the circumstances in which a defendant would succeed in convincing a court that she has told what she believed to be the truth, in the face of the obvious falsity of the information proffered, are even rarer. They are so rare, in fact, that they need not be feared and certainly cannot properly form the basis for a manifest disregard of plain statutory language.

## V.

What makes this case odd, and so raises the problem, is the absurdity of the government's concession, which both the dis-

trict court and the majority of this panel accept *arguendo*. Let me be absolutely clear. My position in no way suggests that the evidence Reynoso proffered was sufficient to carry her burden of proof. Because, however, the government *conceded* that Reynoso believed she was telling the truth, I have no choice but respectfully to dissent.