# COURT OF APPEALS OF VIRGINIA

**Record No. 0434-25-3**

CARRIE SUSANNE DAVIS, S/K/A
CARRIE ANN DAVIS
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Ortiz, Causey and Callins

Argued at Lexington, Virginia

Opinion Issued May 26, 2026

**FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY**
Christopher B. Russell, Judge

Jonathan B. Tarris (Tarris Law PLC, on brief), for appellant.

Sandra M. Workman, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**PUBLISHED OPINION BY**
**JUDGE DOMINIQUE A. CALLINS**

Carrie Susanne Davis appeals her convictions for one count of possessing methamphetamine with the intent to distribute and three counts of possessing a Schedule I or II controlled substance. She argues that the circuit court erred in denying her motion to suppress, failing to apply the safety valve provision to her mandatory minimum sentence under Code § 18.2-248(C), and implementing a disproportionate sentence. For the following reasons, we affirm the judgment of the circuit court.

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

In January 2024, Corporal C. W. Wade of the Rockbridge County Sheriff's Office stopped Davis's van after she ran a red light. Corporal Wade called Deputy Sheriff C. A. Goodbar to provide "officer safety" before obtaining Davis's information. Deputy Goodbar arrived by the time Corporal Wade was returning to his vehicle. Corporal Wade asked Deputy Goodbar to prepare a summons. Corporal Wade then returned to Davis's vehicle, asked her to step out, and informed her he would run a drug sniff. He offered Davis a coat and allowed her to sit in the passenger area of his car to stay warm while he conducted the drug sniff. Unprompted, Davis admitted she had methamphetamine in the vehicle and produced a "glass smoking device from her person." Corporal Wade asked her to return to the car to stay warm, telling her that she was "not under arrest or anything like that." Between the time when Deputy Goodbar began writing the summons and Corporal Wade's drug dog returning a positive alert, "[p]robably not even a minute" passed.

When the dog alerted, Corporal Wade "asked [Davis] again where any items were in, inside the vehicle." She indicated she had "a substantial quantity of methamphetamine in the vehicle" located in the "rear passenger area right behind her seat." Corporal Wade then searched the vehicle, finding U.S. currency, "different baggies of illicit substances," later confirmed to be cocaine, oxycodone, and acetaminophen, and "a large quantity of white crystalline material," later confirmed to be 57.2 grams of methamphetamine. By this time, Deputy Goodbar finished writing the traffic summons for Davis but did not print it.

_____

[2] We recite the facts in the light most favorable to the prevailing party in the circuit court—here, the Commonwealth. *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc). In doing so, if "this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

Based on Davis's admissions and materials recovered from her van, Corporal Wade arrested her and administered *Miranda*[3] warnings. At the station, Corporal Wade again administered *Miranda* warnings and told her that he "could not make any promises" regarding cooperation, but if she could help, "that could be taken into consideration." Davis agreed to speak and told Corporal Wade that "she [had] purchased a . . . QP," meaning "a quarter pound of methamphetamine," from someone named "Ken" in Roanoke. Davis admitted that she was distributing methamphetamine.

Then, while out on bail in March 2024, Sergeant K. M. Randozzo stopped Davis for speeding and failing to wear her seatbelt. He informed her that he would issue traffic summonses and called Corporal Wade to conduct a drug sniff. Corporal Wade arrived within "a matter of minutes." He asked Davis to step out to the rear of her vehicle before he conducted the dog sniff and got "a positive identification on the vehicle." Corporal Wade informed Sergeant Randozzo of the positive drug sniff before Sergeant Randozzo had even finished writing the summonses. A subsequent search yielded a black digital scale with an off-white powder residue, later confirmed to be methamphetamine. Sergeant Randozzo arrested Davis, administered *Miranda* warnings, and transported her to the sheriff's office.

A grand jury indicted Davis for one count of possessing at least 20 grams, but less than 200 grams, of a mixture containing methamphetamine with the intent to distribute and three counts of possessing a Schedule I or II controlled substance. She moved to suppress evidence uncovered during both traffic stops on Fourth and Fifth Amendment grounds. She argued that the drug sniffs unconstitutionally prolonged both traffic stops. She further asserted that she felt

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").

coerced into acquiescing to Corporal Wade's requests during each stop. The circuit court denied her motion.

Davis entered conditional guilty pleas, reserving her right to appeal the court's ruling on the motion to suppress.[4] After finding Davis had "voluntarily and knowingly" entered her guilty pleas, the circuit court convicted her of the four offenses. Davis asked to testify at this hearing "just to make sure that she[ had] met the burden" to invoke a safety valve to the mandatory minimum sentence for her possession with the intent to distribute conviction. But the court replied, "[w]e usually do that at the sentencing hearing." So Davis did not testify that day, though she filed written objections to imposition of the mandatory minimum.

Davis fully availed herself of the opportunity to be heard at sentencing, testifying to her mitigating circumstances and cooperation with the police, presenting seven other witnesses, and admitting into evidence eight letters of recommendation. Davis again stated that she "did as [she] was asked" and that she "cooperated" with law enforcement officers following the arrests. On cross-examination, Davis admitted to selling methamphetamine, not "by the gram [but] by the ounce." And when asked how she had been paying for the drugs that she used between her two arrests, Davis stated only that "someone was getting [her] high" and that a "friend of [hers] had gotten [her] high."

Before sentencing Davis, the circuit court offered her an opportunity to allocute. The court stopped her from speaking, however, when she attempted to use the opportunity to add additional testimony. Later, reflecting on the safety valve to the mandatory minimum for her

---

[4] In entering her conditional guilty plea, Davis's counsel reserved the right "to appeal the Motion to Strike." But Davis never moved to strike. So we presume either that counsel misspoke or the court reporter mistranscribed. *See* Code § 19.2-254 ("With the approval of the court and the consent of the Commonwealth, a defendant may enter a conditional plea of guilty in a misdemeanor or felony case in circuit court, reserving the right, on appeal from the judgment, to a review of the adverse determination of any specified pretrial motion.").

possession with the intent to distribute conviction, the court lamented the inadequacy of Davis's cooperation with the sheriff's office:

> [S]aying you go[t] this from a person named Ken . . . it's really not even close. . . . And it's your obligation to provide [truthful and complete information]. It's not the Commonwealth's obligation to demand that you subject yourself to questioning. . . . And, you know, and then even today when you said on bail you continued using illegal drugs, committing felony offenses on bail for a serious crime and you said someone's getting me high, I mean, you know, it's your obligation to provide levels and levels more detail than that because that's one of the related offenses that is triggered by this paragraph.

The court acknowledged that "there [were] mitigating things here," but underscored the severity of the aggravating circumstances, like the amount of methamphetamine that Davis possessed in January, and her continued drug use between arrests.

The circuit court sentenced Davis to 6 years total of active incarceration: 20 years with 15 suspended for possession of methamphetamine with the intent to distribute, imposing the mandatory minimum sentence, and 4 years with 3 suspended for each possession conviction, running concurrently. This appeal followed.

## ANALYSIS

Davis argues that the circuit court erred by (1) denying her motion to suppress; (2) declining to apply the exception to the mandatory minimum sentence set forth in Code § 18.2-248(C)(3)[5]; (3) imposing a sentence "grossly disproportionate to the offense and unsupported by the record"; (4) imposing "a sentence based on materially inaccurate and incomplete information"; and (5) "curtailing [her] right to present mitigating evidence in support of her sentencing position." We consider her arguments in turn.

---

[5] Davis was originally charged and convicted under then-Code § 18.2-248(C)(4). But the General Assembly amended this subsection in March 2025, keeping its text the same but recodifying it at Code § 18.2-248(C)(3). 2025 Va. Acts chs. 394, 403. For this reason, we refer to Code § 18.2-248(C)(3) throughout the opinion.

I.  Suppression

Davis first argues the circuit court erred in denying her motion to suppress.  She asserts that the canine sniff violated her Fourth Amendment rights by unnecessarily prolonging the stop.  And she argues that Corporal Wade violated her Fifth Amendment rights by subjecting her to custodial interrogation without reading her *Miranda* rights.  We disagree on both fronts.

We review de novo the circuit court's denial of Davis's motion to suppress.  *See, e.g.*, *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008) (reviewing Fourth Amendment issues de novo); *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (reviewing Fifth Amendment issues de novo).  That said, when we review the circuit court's ruling, we defer to its factual findings unless plainly wrong or without evidentiary support.  *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc).  We are also obligated to consider all reasonable inferences drawn from those factual findings.  *Id.*

The Fourth Amendment to the United States Constitution guards against "unreasonable searches and seizures," providing that "no Warrants shall issue, but upon probable cause."  Warrantless searches are "per se unreasonable," save a "few specifically established and well-delineated exceptions."  *Smith v. Commonwealth*, 41 Va. App. 704, 712 (2003) (quoting *Megel v. Commonwealth*, 262 Va. 531, 534 (2001)).  One such exception recognizes the "narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause."  *Michigan v. Summers*, 452 U.S. 692, 698 (1981) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)).  Officers must have reasonable articulable suspicion to justify these limited intrusions.  *Terry*, 392 U.S. at 21.  Reasonable articulable suspicion is "some minimal level of objective justification" for an investigatory detention, *Branham v. Commonwealth*, 283 Va. 273, 280 (2012), and is "less stringent than probable cause," *Parker v. Commonwealth*, 255 Va. 96, 104 (1998).

Traffic stops are a type of *Terry* stop whose scope is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Traffic stops become unlawful "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Myers v. Commonwealth*, 83 Va. App. 656, 668 (2025) (quoting *Rodriguez*, 575 U.S. at 354). Officers may "check[] the driver's license, determine[] whether there are outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355; *see also Commonwealth v. Knight-Walker*, ___ Va. ___, ___ (Apr. 16, 2026) (standing for the same proposition). They may also "order the driver to get out of the vehicle." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). And a dog sniff during a traffic stop is permissible if it does not "add[] time to" the stop. *Rodriguez*, 575 U.S. at 357; *see also Caballes*, 543 U.S. at 409 (holding that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests").

Meanwhile, the Fifth Amendment to the United States Constitution prohibits compelling a criminal defendant "to be a witness against himself," and the Fourteenth Amendment incorporates this right against the states. *See Malloy v. Hogan*, 378 U.S. 1, 7 (1964). To secure this right, the Commonwealth "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The circuit court must exclude statements from the accused unless he was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

Custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Determining whether an accused is in "custody" requires us to consider "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Aldridge v. Commonwealth*, 44 Va. App. 618, 642 (2004) (quoting *Harris v. Commonwealth*, 27 Va. App. 554, 564 (1998)). And "interrogation" occurs by "express questioning" or through "words or actions on the part of police . . . that [they] should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). We consider the totality of the circumstances to decide whether an accused was in custody, *Aldridge*, 44 Va. App. at 642, and whether "the officers' methods constituted coercive police activity," *Thomas v. Commonwealth*, 72 Va. App. 560, 580 (2020).

Davis fails to persuade us that either canine sniff prolonged the associated traffic stop. In January, Corporal Wade lawfully stopped Davis after observing her run a red light. By the time Corporal Wade returned to his vehicle after obtaining Davis's information, Deputy Goodbar arrived on scene to assist. Corporal Wade asked Deputy Goodbar to prepare a summons for Davis's traffic infraction. Corporal Wade then returned to Davis's vehicle, asked her to step out, and informed her he would run a dog sniff. Between the time when Deputy Goodbar began writing the summons and Corporal Wade asking him to stop because the dog sniff returned a positive alert, "[p]robably not even a minute" passed. Since Corporal Wade did not measurably extend the stop beyond the time necessary to complete "tasks tied to the traffic infraction," he did not unconstitutionally prolong it. *See Myers*, 83 Va. App. at 668 (quoting *Rodriguez*, 575 U.S. at 354). This conclusion applies a fortiori to the March stop, where Corporal Wade informed Sergeant Randozzo of the positive drug sniff before Sergeant Randozzo had even finished writing the summonses.

Davis also fails to convince us that the deputies coerced her statements during a custodial interrogation. Indeed, she was neither in "custody" nor subject to "interrogation" in either stop. Both stops were over within a matter of minutes, featured only two deputies, conducted in public, and without using physical restraints, like handcuffs. The deputies did not display their weapons or threaten Davis; in fact, in January, Corporal Wade assured Davis that she was "not under arrest or anything like that." "The brief detention and nature of the questioning" to "quell or confirm" the deputies' suspicions were "dramatically different from the coercive influences in 'police dominated, station house interrogations.'" *Cherry v. Commonwealth*, 14 Va. App. 135, 140 (1992) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Put simply, the "noncoercive aspect" of these "ordinary traffic stops prompts us to hold that" Davis's temporary detentions were not custodial. *May v. Commonwealth*, 3 Va. App. 348, 353 (1986) (quoting *Berkemer*, 468 U.S. at 440).

Accordingly, because the canine sniffs did not unconstitutionally prolong either stop and Davis's statements were made in non-custodial contexts, the circuit court did not err by denying her motion to suppress.

II. Mandatory Minimum Sentence

Davis also argues that the circuit court erred in imposing the five-year mandatory minimum sentence prescribed by Code § 18.2-248(C)(3), rather than invoking the statute's safety valve provision. In particular, she argues that "the record demonstrated her substantial compliance with the statute." We disagree.

We review sentencing decisions for an abuse of discretion. *Commonwealth v. Greer*, 63 Va. App. 561, 567 (2014). Circuit courts abuse their discretion by giving undue weight to an improper factor, failing to give proper weight to a relevant factor, or by committing a clear error of judgment. *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013). But we review de novo a circuit

court's statutory interpretation attendant to a sentencing decision. *Greer*, 63 Va. App. at 568. And we defer to the circuit court's related factual findings unless plainly wrong or without evidentiary support. *Campbell v. Commonwealth*, 39 Va. App. 180, 186 (2002).

Familiar principles govern our interpretation of Code § 18.2-248(C)(3). We must "ascertain and give effect to legislative intent" as reflected by the words used in the statute. *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) (quoting *Brown v. Commonwealth*, 284 Va. 538, 542 (2012)). We determine that intent by referring to the "plain meaning of the words contained in [the] statute." *Tanner v. Commonwealth*, 72 Va. App. 86, 98 (2020) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 282 (2017)). We prefer the "plain, obvious, and rational meaning of a statute" over "curious, narrow, or strained" constructions. *Id.* at 99 (quoting *Banks*, 67 Va. App. at 282). And if the statute's language is clear and unambiguous, "we rely on the plain words, and no interpretation is necessary." *Id.* Dictionary definitions and relevant analysis in our prior cases inform our understanding of the plain meaning of a statute's words. *See Perry v. Commonwealth*, 84 Va. App. 165, 170 (2025).

Ordinarily, a conviction under Code § 18.2-248(C)(3) carries a five-year mandatory minimum term of incarceration. *See* Code § 18.2-12.1 (defining "[m]andatory minimum" as requiring imposition of "the entire term of confinement" that the sentencing court may not suspend "in full or in part"). But if a sentencing court makes certain findings, Code § 18.2-248(C)(3) permits waiving the mandatory minimum sentence. Among other things, the statute's safety valve provision requires that the sentencing court find that:

> Not later than the time of the sentencing hearing, the person has truthfully provided to the Commonwealth all information and evidence the person has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the person has no relevant or useful other information to provide or that the Commonwealth already is aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Code § 18.2-248(C)(3)(e). The safety valve's language is clear and unambiguous. Invoking Code § 18.2-248(C)(3)'s mandatory minimum waiver requires a finding that the accused disclosed "all" related information and evidence available to them prior to sentencing, though the information need not be useful. The accused bears the burden to prove their compliance with this disclosure requirement by a preponderance of the evidence. *Stone v. Commonwealth*, 297 Va. 100, 101 (2019). They must also prove *timely* compliance, meaning that the accused disclosed "prior to the commencement of the sentencing hearing." *Hall v. Commonwealth*, 296 Va. 577, 583 (2018) (quoting *Sandidge v. Commonwealth*, 67 Va. App. 150, 160 (2016)).

At bottom, the parties dispute the meaning of the word "all." Elementary as it is to say, this Court has regularly interpreted the word "all" to mean "*all.*" *See, e.g.*, *King v. Commonwealth*, 53 Va. App. 257, 263 (2009) (interpreting Code § 18.2-280(C)); *Jacks v. Commonwealth*, 74 Va. App. 783, 790 (2022) (interpreting our Supreme Court's COVID-19 emergency orders); *English v. Quinn*, 76 Va. App. 80, 88-89 (2022) (same). In doing so, we have recognized that "all" is an "unrestrictive modifier[]" that we "generally consider[] to apply without limitation." *King*, 53 Va. App. at 263 (quoting *Sussex Cmty. Servs. Ass'n v. Va. Soc'y for Mentally Retarded Child.*, 251 Va. 240, 243 (1996)). But only the accused knows the outer limits of the relevant "information and evidence" they may provide the Commonwealth for Code § 18.2-248(C)(3) purposes. For this reason, the timeliness requirement affords the Commonwealth an opportunity to "confirm the truthfulness and complete disclosure of information" *before* the sentencing hearing. *Sandidge*, 67 Va. App. at 160.

Our federal step-sibling courts have interpreted nearly identical language in the analogous safety valve provision applicable to violations of the Controlled Substances Act. *Compare* 18 U.S.C. § 3553(f)(5) *with* Code § 18.2-248(C)(3). We find the United States Court of Appeals of the Fourth Circuit's pronouncements on the statute most persuasive. The Fourth Circuit has construed

the requirement that the accused "truthfully provide[] to the Government all information and evidence," 18 U.S.C. § 3553(f)(5), as obligating an accused to "affirmatively act[]" in furnishing information, *United States v. Ivester*, 75 F.3d 182, 185 (4th Cir. 1996). Put differently, the Fourth Circuit reads the safety valve provision as imposing no duty on the government's part to seek out information from the accused. *Id.* Whether the government agrees or not, an accused must persuade the sentencing court that they, in fact, met their disclosure obligations. *United States v. Wilson*, 114 F.3d 429, 432 (4th Cir. 1997).

We conclude that Code § 18.2-248(C)(3)'s safety valve provision places an affirmative obligation on an accused to disclose *all* related information and evidence within their knowledge and possession to the Commonwealth. They must do so prior to sentencing so that the Commonwealth may test the veracity and completeness of the information and consider her position on the Code § 18.2-248(C)(3)(e) finding. And, regardless of the Commonwealth's position, an accused must convince the *circuit court* that they complied with their disclosure obligations. Whether an accused meets this burden is a question of fact determined on a case-by-case basis.

Here, the circuit court's finding that Davis failed to comply with her disclosure obligations was not plainly wrong or without evidentiary support. In January, Davis told Corporal Wade that "she [had] purchased a . . . QP," or "a quarter pound of methamphetamine," from a man named "Ken" in Roanoke. She admitted that she had never met Ken, that "they changed their number every so often," and that she "had to wait on them to call [her]." However, she provided no other information about how, when, and where she obtained her supply of drugs. She then continued distributing drugs as evidenced during the March stop. That time, she averred that "someone" or "[a] friend" was "getting [her] high." Beyond this, she gave no other identifying information, like a physical description or name. Though she argues she would have offered more information had the circuit court not cut her testimony off during sentencing, she fails to recognize that she was

obligated to offer the information *before* the hearing began.[6]  *Sandidge*, 67 Va. App. at 160.  Given the noticeable gaps in Davis's disclosures, the circuit court's finding that she needed to "provide levels and levels more detail" was not plainly wrong or without evidentiary support.

Because Davis did not satisfy all prerequisites to applying the Code § 18.2-248(C)(3) safety valve, the circuit court did not abuse its discretion in imposing the mandatory minimum sentence.

III.  Cruel and Unusual Punishment

Davis then contends that her combined six-year active prison sentence was "grossly excessive," thereby constituting cruel and unusual punishment prohibited under both the United States and Virginia Constitutions.  We disagree.

We do not disturb a sentencing court's judgment as an abuse of discretion when the sentence "does not exceed" the maximum imprisonment penalty.  *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)).  And we have held that "proportionality review 'is not available for any sentence less than life imprisonment without the possibility of parole.'"  *Cole v. Commonwealth*, 58 Va. App. 642, 654 (2011) (quoting *United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009)); *see also Cheripka v. Commonwealth*, 78 Va. App. 480, 506 (2023) ("[T]he Court declines to engage in a proportionality review in cases that do not involve life sentences without the possibility of parole.").

Here, Davis was not sentenced to life imprisonment without parole.  *See Cole*, 58 Va. App. at 654.  In fact, her sentences were below the statutorily prescribed maximum punishments for the

---

[6] We agree with our concurring colleague that principles of fundamental fairness are implicated by the trial court's refusal to consider safety valve evidence at the sentencing hearing. This is particularly true, as the concurrence notes, when Davis's introduction of the evidence was in compliance with the trial court's directives.  Would that the issues addressed by the concurrence, however, were briefed by the parties or argued before this Court, we, too, might be inclined to address them.  But as those issues are not before the Court at this time, we restrain ourselves to the matter at hand: whether the trial court erred in finding that Davis did not disclose "all" information necessary to apply the safety valve.

offenses. The circuit court only imposed 20 years with 15 suspended, well below the maximum it could have imposed. *See* Code § 18.2-248(C)(3). And she could have faced up to ten years in prison for each simple possession conviction, but the circuit court instead sentenced her to four years with three suspended on each. *See* Code §§ 18.2-10(e), -250(A)(a). Accordingly, the court did not abuse its sentencing discretion. *See Minh Duy Du*, 292 Va. at 564.

CONCLUSION[7]

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed*.

---

[7] Davis's remaining arguments are not properly before us. She argues that the deputies violated her due process rights by conducting a "two-step" interrogation. And she avers the circuit court erred by finding her not credible and violating her due process rights by curtailing her presentation of mitigating evidence. But she did not timely raise these arguments with the circuit court. Rule 5A:18 mandates that "[n]o ruling of the [circuit] court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." She never presented the former argument to circuit court. *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) ("If a party fails to timely and specifically object, he waives his argument on appeal."). Though she raised the latter argument in her motion to reconsider, the circuit court did not rule on the motion until *after* its jurisdiction lapsed—rendering its order a nullity. *See Westlake Legal Grp. v. Flynn*, 293 Va. 344, 352 (2017) ("A motion to reconsider is insufficient to preserve an argument not previously presented unless the record establishes that the court had an opportunity to rule on the motion."); *see also Lewis v. Commonwealth*, 18 Va. App. 5, 9 (1994) (holding a circuit court's ruling made more than 21 days after entering a final order was a "nullity"). Since Davis does not invoke Rule 5A:18's exceptions and we do not invoke them sua sponte, we are unable to reach the merits of these arguments. *See Arrington v. Commonwealth*, 53 Va. App. 635, 642 n.7 (2009).

Causey, J., concurring.

I concur that Davis's convictions should be affirmed. I also agree with the majority that, under the particular circumstances of this case, the circuit court was not plainly wrong or without evidence to support its conclusion that Davis failed to satisfy the requirements of the Code § 18.2-248(C) "safety valve" for an exemption from mandatory minimum sentencing. I write separately, however, to emphasize certain holdings regarding the "safety valve" provision that are not rendered in and should not be inferred from the majority's decision today, as well as to express my views on two aspects of this important provision.

## I. Low-Level Drug Operatives' Knowledge of High-Level Information

First, I emphasize that the majority neither holds nor implies that circuit courts determining the testimonial credibility of prospective Code § 18.2-248(C)(3)[8] safety valve recipients may simply presume that low-level participants in drug distribution operations *must* possess significant, high-level information about the drug distribution scheme (including about the "kingpin," supplier, or other high-level participants in that scheme). Further, I emphasize that for a circuit court to deny safety valve relief based solely on such a generalized presumption would be arbitrary and speculative and therefore not be entitled to appellate deference.

As has been noted in the context of the identical federal safety valve provision, the very purpose of the safety valve is to permit relief from mandatory minimum sentencing for low-level offenders who "will naturally have less information than higher-ups." *United States v. Tobias*, 101 F.4th 473, 479 (6th Cir. 2024) (citing *United States v. Carpenter*, 142 F.3d 333, 336 (6th Cir. 1998)). This is why the safety valve contains explicit language prohibiting denials on the

_____

[8] At the time of the entry of Davis's sentencing order in this case, the relevant safety valve provision was codified under Code § 18.2-248(C)(4). In 2025, the code section was revised such that it is now covered by Code § 18.2-248(C)(3). For ease of reference, I refer to the latter code section in this concurrence.

- 15 -

basis of a defendant's lack of "useful" or "relevant" information for the government. *See* Code § 18.2-248(C)(3); 18 U.S.C. § 3553(f). Specifically, the provision was created for the purpose of permitting relief for those who, due to their low-level positions in a drug trafficking scheme, likely lack high-level information to trade for prosecutorial or sentencing leniency—an imbalance that otherwise creates an unfair inversion of opportunities for relief among high and low-level offenders. *See, e.g.*, *United States v. Acosta-Olivas*, 71 F.3d 375, 378 (10th Cir. 1995) ("As the legislative history of the section states, without such a safety valve, for 'the very offenders who most warrant proportionally lower sentences—offenders that by guideline definitions are the least culpable—mandatory minimums [would] generally operate to block the sentence from reflecting mitigating factors.'" (quoting H.R. Rep. No. 103-460, 103d Cong., 2d Sess. (1994)); *United States v. Shrestha*, 86 F.3d 935, 938 (9th Cir. 1996) ("Congress enacted § 3553(f) to rectify an inequity in this system, whereby more culpable defendants who could provide the Government with new or useful information about drug sources fared better under § 3553(e) than lower-level offenders, such as drug couriers or 'mules,' who typically have less knowledge." (citing *United States v. Arrington*, 73 F.3d 144, 147 (7th Cir. 1996))).

The first four requirements of Code § 18.2-248(C)(3) ensure that only low-level offenders may receive the protection of the safety valve as long as they provide the (likely minimal) information that they possess. Pursuant to those first four factors, safety valve relief is only available to defendants who generally lack significant criminal history, have not used violence, and are not "an organizer, leader, manager, or supervisor of others in the offense, [and have not] engaged in a continuing criminal enterprise." Code § 18.2-248(C)(3)(a)-(d).

The fifth factor, and the one at issue here, requires that a defendant have "truthfully provided to the Commonwealth all information and evidence the person has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or

- 16 -

plan." Code § 18.2-248(C)(3)(e); *see also* 18 U.S.C. § 3553(f)(5). As explained above, the motivating presumption behind the safety valve is that those who are low-level offenders—having satisfied factors Code § 18.2-248(C)(3)(a)-(d)—will *lack* significant, high-level information to "truthfully provide" under this fifth factor. *See Tobias*, 101 F.4th at 479; *Acosta-Olivas*, 71 F.3d at 378; *Shrestha*, 86 F.3d at 938.

Considering the statutory purpose and structure discussed above, it is clear that if a circuit court performing Code § 18.2-248(C)(3) assessments were to conclude that a low-level offender was lying simply because the circuit court *presumes* that any such person *must* possess high-level information about their suppliers or about the broader drug distribution scheme, the very purpose of the safety valve would be frustrated.

Of course, a circuit court's determination whether a safety valve applicant has "truthfully provided" information under Code § 18.2-248(C)(3)(e) involves a credibility determination, to which this Court gives significant deference. *Hall v. Commonwealth*, 296 Va. 577, 587 (2018); *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009) ("We give deference to the fact finder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony."). Therefore, if a circuit court judge's determination that a safety valve applicant has been dishonest is based on valuable in-person observations about the witness, or other specific, relevant evidence undercutting the applicant's story, such a finding merits this Court's deference.

But this Court's deference is not limitless. It is firmly decided Virginia law that a negative credibility determination that is arbitrary, speculative, or based on suspicion merits no deference. *See Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 71 (2021) ("[A]lthough a fact-finder must determine the weight and credibility of witnesses, it may not *arbitrarily disregard* uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with the facts in the record, even though such witnesses are interested in the

outcome of the case." (additional emphasis added) (quoting *Breckenridge v. Marval Poultry Co.*, 228 Va. 191, 195 (1984))); *Epperson v. DeJarnette*, 164 Va. 482, 486 (1935) (same); *ADO Home Servs., LLC v. Frykman*, 85 Va. App. 55, 83 (2025) (citing *Spratley v. Commonwealth*, 154 Va. 854, 857 (1930)); *Cheatham v. Gregory*, 227 Va. 1, 4 (1984) (reversing a negative credibility determination based on "suspicion . . . based upon speculation rather than evidence").[9] This appellate safeguard is particularly important to emphasize in the context of safety valve credibility determinations. Code § 18.2-248(C)(3) applicants are placed, by statute, in the potentially perilous position of having to convince the court of *a negative*: that they do *not* know more information that they have *not* said. *See United States v. Gales*, 560 F. Supp. 2d 27, 29 (D.D.C. 2008) (discussing the difficulties of a credibility determination conducted under these circumstances)[10]; *see also* W. Hamilton Bryson, *Bryson on Virginia Civil Procedure* § 6.03 (5th ed. 2017) (noting that "it is enormously difficult to prove a negative"). Such persons must be protected against arbitrary denials based on suspicion.

Consistent with Virginia's rule against arbitrary factfinding, federal appellate courts have held that a court may not disbelieve a safety valve applicant's testimony without a solid reason to do so—they cannot assume that a safety valve applicant has lied "based on pure speculation." *United States v. Miller*, 179 F.3d 961, 969 (5th Cir. 1999); *see also United States v. Miranda-Santiago*, 96 F.3d 517, 529 (1st Cir. 1996) ("The government cannot ensure success simply by saying, 'We don't believe the defendant,' and doing nothing more."); *United States v.*

---

[9] Recall that the governing standard of review for safety valve factual findings is whether the circuit court's conclusion was "plainly wrong or without evidence to support it." *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002). A negative credibility determination that rests solely on a speculative presumption, rather than on particular evidence or in person observation, is, by definition, a conclusion without evidentiary support. *See id.*

[10] *See also* Natasha Bronn, *Unlucky Enough to be Innocent: Burden-Shifting and the Fate of the Modern Drug Mule under the 18 U.S.C. § 3553(f) Statutory Safety Valve*, 46 Colum. J.L. & Soc. Probs. 469 (2013).

*Collins*, 924 F.3d 436, 443 (7th Cir. 2018) ("[T]he Government cannot carry the day by simply telling the district court that *it* does not believe the defendant or by inviting the district court to indulge in speculation.").[11]  In particular, federal courts of appeals have not looked kindly on district courts' negative credibility determinations reached via a presumption that low-level drug operatives applying for safety valve relief "simply must know more" than they say.

In *United States v. Miller*, the Fifth Circuit considered a defendant who was found selling two kilograms of cocaine and stated that he had only recently learned to dry cocaine (a part of the cocaine manufacturing process).  179 F.3d at 967.  The government argued to the district court that "because Miller was no stranger to cocaine *trafficking*, he *surely lied* when he [stated] he had only just learned how to dry cocaine," and the district court agreed, thus denying the defendant safety valve relief.  *Id.* (emphases added).  The appellate court found this reasoning "merely speculative," and thus reversed the district court's denial of safety valve relief.  *Id.* at 969.

In *United States v. Miranda-Santiago*, the First Circuit considered a "passive" participant in a drug trafficking scheme who denied high-level knowledge of the scheme but "shared living quarters with other co-defendants" in the scheme.  96 F.3d at 529.  The district court consequently denied safety valve relief, finding the defendant did not "cooperate fully."  *Id.*  The circuit court reversed.  It stated that the defendant's cohabitation with other participants was a

---

[11] In *United States v. Aidoo*, 670 F.3d 600, 610 (4th Cir. 2012), the Fourth Circuit held that it was permissible for the factfinder to render a negative credibility finding on the basis of a story's "implausibility" where the factfinder also specifically focused on "the fact that Aidoo lied during his proffer session" about a material fact.  This holding is perfectly consistent with the above cases rejecting arbitrary or speculative factfinding.  In Virginia, too, factfinders may place weight on whether a witness has "knowingly testified untruthfully as to any material fact in the case" in assessing their credibility.  *Williams v. Auto Brokers*, 6 Va. App. 570, 574 (1988).  So long as the material fact lied about is relevant and weighty enough—*see also Aidoo*, 670 F.3d at 613-14 (Gregory, J., dissenting) (opining that the information lied about was not sufficiently relevant to support the finding)—a resultant negative credibility finding will not be set aside as arbitrary or speculative.  *See Grayson*, 300 Va. at 71; *Epperson*, 164 Va. at 486.

"wholly inadequate" basis for the conclusion that she lied when she said she lacked more information. *Id.* at 529. It further said:

> Section 3553(f)(5)[,] [the federal "safety valve" provision,] does not invite such *speculation*. If *mere conjecture based on personal relationships* could bar application of section 3553(f)(5), in all cases where minor participants knew others more involved, the safety valve provision would be beyond their grasp. Such a result was not intended by Congress and cannot be permitted here.

*Id.* at 529 (emphases added).

*United States v. Barron*, 940 F.3d 903, 918 (6th Cir. 2019), a Sixth Circuit case, concerned a defendant who provided significant information about his participation in a conspiracy to distribute cocaine, but, in relevant part, did not tell the government "where the $105,375 that officers found on top of the cocaine originated." The district court denied safety valve relief partly on the basis of this omission. *Id.* The appellate court noted that "the government never offered any evidence that Barron knew where the cash came from" and said, "it is not unreasonable to assume that Barron—whom the government agrees is a low-level offender—would not have this information 'because of [his] *relatively low position* in the criminal enterprise.'" *Id.* (alteration in original) (emphasis added) (quoting *Carpenter*, 142 F.3d at 336). For these reasons, among others, the court's safety valve denial was reversed. *Id.* at 921.

As our Supreme Court has stated, there is no "mandatory formula" for a Virginia circuit court's evaluation of a witness's credibility, as many factors can be relevant to a credibility analysis. *Johnson v. Commonwealth*, 273 Va. 315, 323 (2007). But, consistent with the cases and principles described above, circuit courts cannot simply deny safety valve relief based on a presumption that because a defendant is involved in a drug operation, he or she *must* know detailed information about its high-level workings or officials. *See Miller*, 179 F.3d at 969; *Miranda-Santiago*, 96 F.3d at 529; *Collins*, 924 F.3d at 443; *Barron*, 940 F.3d at 918. Such a

- 20 -

finding, based simply on this presumption and without more particular evidence to support it, would be arbitrary and speculative, *see Grayson*, 300 Va. at 71—not to mention at odds with the purpose of the statute. Instead, courts' credibility determinations in the safety valve context must, at the very least,[12] be reasoned in accordance with all other credibility findings. *See Williams v. Auto Brokers*, 6 Va. App. 570, 574 (1988) (noting factors that may be considered by a factfinder in determining credibility); *Hall*, 296 Va. at 587 (noting that a circuit court may "consider the last-ditch nature" of a late safety valve disclosure as one non-dispositive part of the credibility "calculus").

In summary, consistent with the core presumptions underlying the safety valve provision and the rule against arbitrary or speculative factfinding, courts assessing safety valve applicants may not simply presume that low-level participants in drug distribution operations must know more high-level information than they have disclosed.

Here, there is very sparse evidence in the record to support a conclusion that Davis "surely lied," *see Miller*, 179 F.3d at 967, when she said she did not know the full name or present contact information for "Ken," the person she identified as the "kingpin." In this case, Davis provided the Commonwealth with the full first and last name for the acquaintance who had connected her with the drug distribution operation. She stated, however, that she was unable to produce a phone number for Ken because he and other higher-ups frequently changed their numbers and would contact her to arrange supplies rather than the other way around. ("[T]hey

---

[12] Some federal circuits—perhaps recognizing the particularly onerous task of proving a negative—appear to have affirmatively recognized a burden-shifting framework as required in safety valve cases. *See* Bronn, *Unlucky Enough to be Innocent*, *supra*. Different circuits have characterized this framework in different ways. *See, e.g.*, *Shrestha*, 86 F.3d at 940 (outlining two separate "burden[s]" on the defendant and government in safety valve cases); *Collins*, 924 F.3d at 444 (arguing that the purported burden-shifting merely requires reasoned factfinding and prohibits negative credibility findings based on "speculation" and that "[t]here is no doctrinal disagreement among the circuits" about this approach). It is beyond the scope addressed in this concurrence whether such a framework might apply in Virginia.

changed their number every so often and, I mean, it was pretty much that you had to wait on them to call you [if you] were gonna get it."). Davis explained that she did not have a last name ("I wasn't able to produce somebody.") because she did not personally know the kingpin ("I mean I don't know the person so I mean like *know them* know them."). The Commonwealth produced no evidence that cast doubt on any of these statements or otherwise showed that Davis would possess such information.[13]

The circuit court, for its part, did not explicitly characterize its ruling as a credibility determination, instead stating that it was Davis's "obligation" to provide more information than she had—both regarding Ken, and with regard to another individual, discussed *infra*. Such a ruling must, however, have rested on a negative credibility determination, unless it required an erroneous interpretation of the law—because unless Davis was lying when she said she did not know these details, it cannot have been her "obligation" to provide them. Code § 18.2-248(C)(3)(e) (requiring only the production of the information that "the person has").

In this case, however, this Court need not determine conclusively whether a negative credibility finding regarding Davis's denial of further information about the kingpin—if such a finding can be inferred—would be arbitrary or speculative. *See Grayson*, 300 Va. at 71; *Cheatham*, 227 Va. at 4; *Miller*, 179 F.3d at 969. Instead, like the majority, I would decide this case on narrower grounds. The majority holds that all of Davis's statements, together, permitted a finding that Davis did not satisfy her safety valve obligations. I agree, specifically, because

---

[13] One possible complication is the fact that Commonwealth attempted to argue, below, that Davis was actually a "mid-level dealer," not a "street-level dealer"—an argument arguably at odds with its concession that Davis met the first four requirements of Code § 18.2-248(C)(3)(a)-(d). The Commonwealth's argument was based on the quantities of methamphetamine that Davis admitted to selling, and Davis's counsel disputed this characterization, also focusing on the relative quantities. This conflict was not resolved in any meaningful way—by the presentation of evidence relevant to this distinction, nor by a finding of the circuit court.

several of Davis's other statements concerning her activities *between* her two arrests—in which she denied purchasing or distributing narcotics during this period[14]—considered collectively, contained sufficient objective indicia of implausibility to support a finding that she was not truthful in her description about certain other "offenses that were part of the same course of conduct or of a common scheme or plan," a finding also implicitly made by the circuit court in this case. Code § 18.2-248(C)(3).

I emphasize, however, that neither the majority nor I base our holding on a position that the circuit court could permissibly employ the presumption which I argue, above, would be speculative and arbitrary. Safety valve applicants, placed in the intrinsically difficult position of proving—in the negative—that they are not withholding further information, must be guarded against such a presumption.

## II. The Relevance of a Lack of Governmental Questioning on Information Not Provided

I would also like to address the Court's discussion of the term "all" in Code § 18.2-248(C). I agree with the majority that this word should be interpreted literally to mean "all" insofar as that term modifies the "information" that safety valve applicants must attempt to

---

[14] First, Davis stated that on the day of her second arrest, despite being discovered with paraphernalia related to drug distribution—including a digital scale with methamphetamine on it—she was not engaged in drug dealing at that time; and instead, she said, she happened to have just retrieved the vehicle that she had been driving the last time she was arrested, which contained these items. Second, Davis denied paying for any narcotics during a period of several months between her two arrests, instead claiming that she was provided drugs for free. Third, she stated that she was given these drugs by a "friend" whom she did not name. Fourth, while Davis initially told the police following her second arrest that she was clean and not using drugs, she later admitted that she had been using drugs during this period. While none of these statements are inherently incredible, and the fact that Davis appears to have equivocated about drug use is surely not dispositive, I would hold that collectively, these statements contain sufficient markers of implausibility to require this court's appellate deference to a negative credibility finding made by the circuit court who observed the witness in person. *See Commonwealth v. Jackson*, 276 Va. 184, 196 (2008) (quoting *Blount v. Commonwealth*, 213 Va. 807, 809 (1973)) (permissible for factfinder to consider whether a witness's statements are "inherent[ly] improbab[le]").

furnish. But, I would stress, this does *not* mean that courts are entirely precluded from considering whether the Commonwealth has ever *asked* about the information that a safety valve applicant has failed to provide. For the reasons I discuss below, I submit the term "truthfully provided" in Code § 18.2-248(C) requires courts to consider safety valve applicants' subjective intentions and good faith attempts to cooperate with the Commonwealth in analyzing apparent omissions in an applicant's evidentiary proffer. When a safety valve applicant has not furnished a piece of information he was never asked, but has otherwise cooperated fully by answering all the questions the government has asked, courts may consider this fact as a relevant part of their evaluation.

First, I will note that while the majority is correct that the Fourth Circuit has held that the government has no obligation to affirmatively approach a defendant to invite them to provide information under the safety valve provision, *United States v. Ivester*, 75 F.3d 182, 184-85 (4th Cir. 1996), this case does not present an occasion to decide precedentially whether such an obligation exists under Virginia law. That point is simply not at issue here; Davis stated, and the Commonwealth agreed, below, that Davis *did* sit for an interview with the government, waived her *Miranda* rights, and provided them with significant information about the drug distribution scheme and her role in it; thus, whether, as the *Ivester* court considered, she had a duty to engage in such an interview, and affirmatively provide evidence, is not relevant. *See id.* at 184 (noting that "the Government sought *no* information from Ivester, and Ivester did not volunteer *any* information about the conspiracy" and rejecting Ivester's position that the safety valve "place[s] on the Government the onus of seeking out defendants for debriefing" (emphases added)). On the other hand, the Fourth Circuit has not considered how courts may properly assess a defendant who interviews with the government and answers all questions asked, but fails to volunteer additional information not requested by the government.

At least two published federal appellate decisions have addressed that issue. These cases featured defendants who provided significant unrebutted information to the government and answered all of its affirmative questions but were denied safety valve relief on the basis that they did not provide *further* information about which they were not asked. In these cases, both decided by the Sixth Circuit, the safety valve denial was reversed, partly due to the lack of questioning on the relevant topic.

One such case was *Barron*, discussed above. In *Barron*, the Sixth Circuit reversed a district court that denied relief in part due to a defendant's purported failure to explain where certain large quantities of cash came from, despite his general attempt to cooperate. 940 F.3d at 918. In addition to criticizing the unreasonable presumption that the defendant would have known this information, the court noted that "there is no evidence in the record demonstrating that the government *ever asked* Barron about the cash, and the government could not provide us with this information at oral argument." *Id.* (emphasis added). This fact, and the related fact that Barron never lied or was deceptive in response to the questions he *was* asked, were central to the court's conclusion that the safety valve denial ultimately rested on impermissible "speculation." *Id.* at 919.

In *United States v. Miller*, 179 F. App'x 944, 948 (6th Cir. 2006), an earlier case (separate from the 1999 case by the same name, described above), a defendant was denied safety valve relief despite cooperating broadly and having had no way to know the relevance of the information he failed to provide—information concerning his interactions with the perpetrators of a murder he was unaware of. The appellate court emphasized that Miller lacked subjective awareness of these circumstances. *Id.* And it also said as follows:

> Had Miller been deceitful or evasive when questioned about these matters, the result would certainly be different. But at the time of the investigation, the government *never asked* Miller about these

> matters. Had the information truly been relevant, investigators
> likely would have made general inquiries into the matters."

*Id.* (emphasis added).

The *Miller* court emphasized that for a defendant to be required to disclose information under the safety valve, the facts must be "'relevant' to the offense of conviction." *Id.* at 947 (quoting *United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996)). And "implicit in requiring a defendant to disclose 'relevant' facts," the court reasoned, "is the defendant's *having reason to believe them relevant*." *Id.* at 948 (emphasis added).

*Barron* and *Miller* demonstrate that in adjudicating safety valve cases, appellate courts do—and, practically, *must*—take into account the fact that an otherwise-highly-cooperative defendant was never specifically asked about certain information that they "fail" to disclose. In both of these cases, for the Sixth Circuit to have reached the opposite conclusion would have bordered on the absurd; it would have denied sentencing relief for a defendant who obviously did all they could to cooperate. *See Butler v. Fairfax Cnty. Sch. Bd.*, 291 Va. 32, 37 (2015) ("[W]e must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in *a manifest absurdity*." (emphasis added) (quoting *Payne v. Fairfax Cnty. Sch. Bd.*, 288 Va. 432, 436 (2014))). Further, decisions to the contrary would establish dangerous precedent. If such applicants could be denied relief, it is not clear what judicial rule would require governmental actors to interact with safety valve applicants in good faith, as opposed to intentionally withholding questioning, at the proffer interview, regarding small bits of information that they intend to later highlight before the circuit court judge. *See Wertz v. Grubbs*, 245 Va. 67, 72 (1993) ("[I]f [a] statute [is] open to two constructions, [a] court will not give it construction that would result in injustice[]." (citing *Harvey v. Hoffman*, 108 Va. 626, 629 (1908))).

I now turn back to the text. The *Barron* and *Miller* courts' conclusions follow from a reasonable reading of the plain text of the statute, which we should adopt both as a matter of plain language, and because it avoids the arbitrary and oppressive results described above.

While the phrase "all information" in the statute is fairly straightforward, "truthfully provided" is less so. "Truthfully" is an adverb that modifies the verb "provides"—it does not modify the direct object, "information." This grammatical structure provides a first clue pointing towards a subjective focus, as it suggests that rather than asking whether the information provided was objectively "true," courts assessing the safety valve provision should focus on the safety valve applicant herself and assess whether she has performed an act of "provid[ing]" information "truthfully." That inquiry, as a matter of plain language, strongly indicates an inquiry into the subjective *mens rea* or good faith of the actor himself.

A second clue is the definition of "truthful," which generally is understood to convey a subjective meaning (akin to *honest*). *See Truthful*, Cambridge Advanced Learner's Dictionary and Thesaurus, https://dictionary.cambridge.org/us/dictionary/english/truthful ("honest and not containing or telling any lies"); *Truthful*, *Merriam-Webster Dictionary* (3rd. ed. 1961) ("Telling or disposed to tell the truth: accurate and sincere in describing reality"); *Truthful*, *American Heritage Dictionary* (5th Ed. 2011) ("1. Consistently telling the truth; honest. 2. Corresponding to reality; true."). A definition focused on a person's honesty with regard to reality as they understand it, as opposed to being focused purely on omniscient accuracy, would appear to be the more common meaning of the term, "truthful."

The grammar and definitions coalesce with traditional legal principles to suggest a subjective focus that takes intent into account. An actor's state of mind has long been held to be a critical and indispensable part of the criminal law. *See Morissette v. United States*, 342 U.S. 246, 250 (1952); *Vacco v. Quill*, 521 U.S. 793, 802 (1997) (quoting *Morissette* for the

proposition that "distinctions based on intent are 'universal and persistent in mature systems of law'").  Consistent with this principle, our Supreme Court has held that a "*mens rea* or *scienter*" requirement will be "read into [a criminal] statute" even when it is only "implicit[]."  *Maye v. Commonwealth*, 213 Va. 48, 49 (1972).

Given all these principles, the term "truthfully provided" in Code § 18.2-248(C)(3) is best read to require courts to perform a subjectively oriented inquiry.  Alternatively, however, and at the very least, courts must regard this phrase as ambiguous.  *See Gillespie v. Commonwealth*, 272 Va. 753, 757-58 (2006) (noting statutory language is ambiguous "if it admits of being understood in more than one way").  Specific evidence of this ambiguity might be found in the fact that it appears to have created a federal circuit split.  *See* Off. of Gen. Counsel, U.S. Sentencing Comm'n, *Drug Primer* (Mar. 2013) (noting the circuit split regarding subjectivity and objectivity and citing *United States v. Thompson*, 76 F.3d 166, 170-71 (7th Cir. 1996), *United States v. Sherpa*, 110 F.3d 656, 659-63 (9th Cir. 1996), and *United States v. Reynoso*, 239 F.3d 143, 144, 150 (2d Cir. 2000)).

For the reasons discussed, I believe that this Court should construe any ambiguity in Code § 18.2-248(C) strictly against the Commonwealth and in favor of lenity, construing "truthfully provided" to contain a subjective component such that a defendant's good faith may be considered.  *See Thompson*, 76 F.3d at 170-71 (holding defendant was appropriately granted safety valve relief in part because evidence supported the conclusion that a defendant whose "perceptual and analytical abilities" were limited "was forthright *within the range of her ability.*" (emphasis added)).

First, as discussed, the grammatical and plain language reading of the statute make a subjective interpretation the more reasonable reading.  *See Reynoso*, 239 F.3d at 150-51 (Calabresi, J., dissenting) (persuasively outlining this argument).  Second, we must recognize

that construing the ambiguity otherwise would cause arbitrary and oppressive results. It would *require* courts to deny safety valve relief whenever the Commonwealth points out the defendant's failure to proffer even the smallest bit of information that could be deemed technically "relevant," even for defendants who have openly submitted themselves to thorough questioning; it would preclude courts from considering whether that omission (even of information never asked) might have been negligent rather than intentional, and perhaps encouraged by the Commonwealth's uniformly focused questioning or omissions in questioning. That situation would be unreasonable and unjust. *See Butler*, 291 Va. at 37; *Wertz*, 245 Va. at 72. It would, further, require construing an ambiguity in a penal statute in the strictest possible manner for defendants—the opposite of what the rule of lenity requires of us. *See Taylor v. Commonwealth*, 77 Va. App. 149, 162 (2015) (citing *Brewer v. Commonwealth*, 71 Va. App. 585, 592 (2020)).

In assessing whether a defendant has "truthfully provided all" requisite information, courts should, of course, consider the objective completeness of the defendant's proffer. But if that evidence contains objective omissions that may have been merely negligent, courts should also consider whether a defendant has nonetheless "truthfully provided all information and evidence" by engaging in a good faith effort to cooperate and answering all questions he or she has been asked honestly. *See Barron*, 940 F.3d at 918; *Miller*, 179 F. App'x at 948; *Thompson*, 76 F.3d at 170-71; *Reynoso*, 239 F.3d 143 (Calabresi, J., dissenting). If the Commonwealth never asked for certain information, that can be a relevant consideration for the court's inquiry concerning the defendant's honesty, good faith, and thus, "truthful[ness]."[15] Code § 18.2-248(C)(3).

---

[15] Like the federal courts that have recognized a good faith component, I hasten to add that the existence of this component should not be interpreted to operate as a straitjacket on defendants, requiring total consistency or perfection; it does *not* mean that a defendant's initial

Returning to the facts of the case at hand, Davis appears to have provided a significant amount of information, but her proffer contained notable gaps.[16] There appears to be little or no evidence, however, that Davis was ever asked by the Commonwealth to provide the details she omitted, as opposed to simply being told by the government that it wanted more information about the identity of the "kingpin," which Davis repeatedly explained she did not know. In fact, an email chain submitted by Davis shows that before the sentencing hearing,[17] the Commonwealth specifically informed her that the government would only consider supporting her eligibility for safety valve relief "[i]f she did something legit to get *the kingpin* behind bars beyond saying she doesn't know who it is." (Emphasis added). That email makes no reference to the Commonwealth's desire for Davis to provide details unrelated to the "kingpin."

The circuit court was certainly permitted to consider the omissions in Davis's disclosure, as they could have supported the finding that her disclosure was not objectively complete. But

---

lies could be construed as overriding later cooperation and provision of necessary information. *See, e.g.*, *United States v. Schreiber*, 191 F.3d 103, 106 (2d Cir. 2002); *United States v. Mejia-Pimental*, 477 F.3d 1100, 1105 (9th Cir. 2007).

[16] Davis provided the Commonwealth with the full name of the person who connected her to the drug operation and the first name of the "kingpin," explained why she could not provide the kingpin's full name or phone number, stated how much methamphetamine she had purchased from him, and stated the quantities and prices of methamphetamine he was selling. On the other hand, Davis did not provide the dates, times, and locations of her purchases of methamphetamine from Ken; she did not provide details concerning the people to whom she was selling methamphetamine; nor did she identify the "friend" who she said was providing her with narcotics in between her arrests. Below, the Commonwealth stressed these omissions in arguing for the denial of Davis's safety valve relief.

[17] I would also hold that under the circumstances of this case, Davis was permitted to present testimony *at* the sentencing hearing that may be considered in establishing her qualification for the safety valve despite our holding in *Sandidge v. Commonwealth*, 67 Va. App. 150 (2016), because in this case, the court and Commonwealth both advised Davis that she would be permitted to do so. Fundamental fairness compels this conclusion. *See, e.g.*, *Miller v. Commonwealth*, 25 Va. App. 727, 735 (1997) (outlining due process protections applicable when a defendant acts upon instructions that a course of action is in compliance with the law); *In re Commonwealth*, 278 Va. 1, 13 (2009) (holding the Commonwealth bound by the approbate-reprobate doctrine).

the circuit court should have also considered the lack of evidence that Davis was ever asked about these topics—and, conversely, the evidence suggesting that Davis appears to have been told that only her provision of other information would be relevant. That apparent lack of evidence was—along with the many other factors available to a court assessing credibility—a relevant part of the analysis as to whether Davis acted "truthfully," honestly lacking an understanding that the Commonwealth desired for her to provide the names of her customers or of her non-kingpin "friend's" name. *See Barron*, 940 F.3d at 918; *Miller*, 179 F. App'x at 948; *Thompson*, 76 F.3d at 170-71; *Reynoso*, 239 F.3d 143 (Calabresi, J., dissenting).

For the reasons discussed previously, however, this Court need not render any holding concerning whether these omissions could have been sufficient to support a denial of the safety valve in this case. I concur with the majority because other evidence in the record was sufficient to support the denial of the safety valve. Nevertheless, going forward, circuit courts conducting Code § 18.2-248(C)(3)(e) inquiries should, at a minimum, consider: (1) what specific information the defendant omitted; (2) whether the Commonwealth ever asked the defendant about that information; and (3) whether the defendant's failure to volunteer that information was consistent with, or inconsistent with, the defendant's overall good faith cooperation. This level of specificity will both guard against arbitrary denials and provide this Court with the record it needs to evaluate future safety valve appeals.